No. 05-183

IN THE SUPREME COURT OF THE STATE OF MONTANA

2005 MT 297

IN RE PARENTING OF K.P.:

J.D.,

        Petitioner and Respondent,

    v.

C.P. and G.P.,

        Respondents and Appellants.

APPEAL FROM:    District Court of the Eleventh Judicial District,
                    In and for the County of Flathead, Cause No. DF 2002-003(C)
                    The Honorable Stewart E. Stadler, Judge presiding.

COUNSEL OF RECORD:

        For Appellants:

                F. Ron Newbury, Attorney at Law, Helena, Montana

        For Respondent:

                Lori B. Miller, Attorney at Law, Whitefish, Montana

Submitted on Briefs:  September 14, 2005

Decided:  November 23, 2005

Filed:

_____
Clerk

Justice Patricia O. Cotter delivered the Opinion of the Court.

¶1      C.P. and G.P., mother and putative father of K.P. (Appellants), appeal the District Court's legal declaration of her biological father's paternity and Order directing the parties to devise a parenting plan for visitation and support. C.P. and G.P. also request a stay of judgment from the District Court Order, while Respondent, J.D., the biological father, requests costs and attorney fees associated with this Appeal. We affirm the District Court, and deny both the Appellants' request for a stay, and Respondent's request for costs and attorney fees.

## ISSUES

¶2      The restated issues on appeal are:

1.      Did the District Court err when it allowed a rebuttal of G.P.'s presumed paternity?

2.      Did the District Court abuse its discretion when it applied Montana's "best interest of the child" standard to recognize J.D.'s paternity?

3.      Should this Court issue a stay of the District Court Order?

4.      Is J.D. entitled to costs and attorney fees resulting from this appeal?

## FACTUAL AND PROCEDURAL BACKGROUND

¶3      K.P., the now three-year old child at the heart of this paternity dispute, was conceived during an extra-marital affair between her mother, C.P., and J.D. The affair occurred while C.P. was temporarily estranged from her husband, G.P. Shortly after finding out she was pregnant, C.P. reconciled with G.P., who with full knowledge of the affair and C.P.'s

2

pregnancy, forgave his wife and then supported her through her pregnancy. G.P. participated in K.P.'s birth, signed K.P.'s birth certificate as her father, and thereafter held K.P. out as his child. During the eighth month of C.P.'s pregnancy, C.P. and G.P. asked J.D. to relinquish any paternity claim and allow them to raise the baby in their family. J.D. declined, and then fearing C.P. and G.P. would prevent contact between him and the child, on July 12, 2002, J.D. petitioned the District Court for a determination of paternity.

¶4     On August 1, 2002, the District Court held a hearing on J.D.'s Petition for Determination of Paternity. At that time, C.P.'s and G.P.'s attorney acknowledged that under Montana law J.D. had a right to request genetic testing to determine whether he was the biological father of C.P.'s yet unborn child. Neither C.P. nor G.P. objected to testing. Moreover, both knew it was unlikely G.P. was the biological father of the child because he had a vasectomy several years prior. As C.P., G.P., and J.D. all agreed to submit to DNA testing, the District Court ordered them each to provide samples for testing within 30 days of the child's birth.

¶5     DNA testing conclusively showed that J.D. was the biological father of K.P.

¶6     In October 2002, the District Court referred this case to Family Court Services (Family Court). In December 2002, J.D. began weekly visitation with K.P. who was then four months old. Initially J.D. was allowed one 30-minute visit per week supervised by the staff at the Nurturing Center in Kalispell, which supervision J.D. arranged. Gradually the duration of K.P.'s visits increased, and moved to J.D.'s home as approved by Family Court. During the visits observed by Family Court's Director, J.D. was "continually . . . on time[,]

3

. . . interested in visits, [and] acted appropriately at visits." Then, in May 2003, following an incident between J.D. and C.P., G.P. disallowed subsequent visitation.

¶7 On May 29, 2003, Family Court filed its Parenting Plan Evaluation and Report with the District Court recommending K.P. be given "every opportunity to know, love, and be cared for by her biological father." Family Court's recommendation was based on: interviews, responses to questionnaires, joint meetings, and home visits with the parties; interviews with professionals involved with the case; interviews with the parties' personal references; observation of K.P.'s interactions with the parties; and reviews of criminal and other court information. Given K.P.'s young age, and the loving home provided by C.P. and G.P., Family Court further recommended that K.P. stay in her mother's primary care, so long as she and G.P. did not deny J.D. visitation, with gradual implementation of parenting time for J.D. Family Court emphasized that K.P. was at a "significant stage of her development," and that "to date, the experiences [C.P.] and [G.P.] have provided in regard to [K.P.]'s association with her natural father are distorted and sad." Family Court recommended that should C.P. and G.P. continue to prevent meaningful interaction between J.D. and K.P., K.P. be placed in J.D.'s primary care.

¶8 J.D. then filed a motion for implementation of an interim parenting plan, for which the District Court held a hearing on June 23, 2003. The court then appointed a guardian ad litem (GAL) to prepare a report regarding K.P.'s best interests.

¶9 At the June 2003 hearing, Appellants' pastor and counselor both testified they believed K.P.'s best interests would be served by C.P.'s and G.P.'s plan for K.P.'s

4

upbringing. They expressed their hope that K.P. would grow up without contact with, nor knowledge of J.D., until she reached an age of maturity when C.P. and G.P. could tell her about the circumstances of her conception, and allow her to decide whether to establish a relationship with J.D. In the interim, C.P. would periodically inform J.D. of K.P.'s well-being through photos, medical records, and letters from C.P.

¶10 The Director of Family Court also testified. On cross-examination, she stated that it is in K.P.'s "best interests to have a relationship with her father, [J.D.]." The Director based her opinion on the investigation she conducted in preparing her written Report, as well as her professional experience and "knowledge of children and their relationships with their parents . . . where children seem to have some need--I would even go so far as to call it an innate need--to know their biological parents. . . . I believe that [K.P.] should be given the opportunity now, rather than to wait until she is 14 and [sic]--or 15 years old and put a decision like that on her. . . ." K.P.'s GAL, after extensive investigation including her own interviews with the parties and others, and observations of K.P. with the parties, agreed with the Director's assessment.

¶11 The District Court, after hearing the evidence, and considering the recommendations of Family Court and K.P.'s GAL, issued Findings of Fact, Conclusions of Law, and Judgment on December 9, 2003, concluding that "the best interests of [K.P.] would be served by recognizing the paternity of [J.D.] and by gradually establishing a parent/child relationship. . . ." Specifically the District Court found: J.D. maintains suitable housing, and acquired appropriate furnishings to care for his young daughter; both K.P.'s mother and

5

J.D. provide a "stable and healthy home environment" for K.P; since before K.P.'s birth, J.D. demonstrated a "full commitment to the responsibilities of parenting [her];" and J.D. has maintained continuous employment, purchased medical insurance for K.P., and paid child support into a banking account in K.P.'s name. The District Court ordered that a parent-child relationship be established between K.P. and J.D., and that the parties exchange final parenting plans and develop a support plan for K.P.

¶12   Following the District Court's entry of judgment, C.P. and G.P. filed numerous motions, including an untimely motion for new trial, a petition to terminate J.D.'s parental rights, a petition for adoption, and two consecutive motions to stay the District Court's Judgment. J.D. then filed a motion for contempt because C.P. and G.P. repeatedly resisted J.D.'s attempts to exercise visitation. Notably, however, despite the flurry of motions filed by both parties, J.D. failed to file a notice of entry of judgment after the District Court ruled in his favor in December 2003. A year later, on December 13, 2004, C.P. and G.P. filed a Notice of Entry of the December 2003 Judgment, and immediately thereafter filed a Notice of Appeal.

¶13   We require prevailing parties to serve a notice of entry of judgment "before the thirty day deadline for filing notice of appeal begins to run." *Quantum Electric, Inc., v. Schaeffer*, 2003 MT 29, ¶ 29, 314 Mont. 193, ¶ 29, 64 P.3d 1026, ¶ 29 (citations omitted). Moreover, such notice may be filed by either party. Rule 77(d), M.R.Civ.P., *In re Estate of Spencer*, 2002 MT 304, ¶ 18, 313 Mont. 40, ¶ 18, 59 P.3d 1160, ¶ 18. Because C.P. and G.P. filed

6

a Notice of Entry of Judgment followed by a timely Notice of Appeal, this matter is properly before us. We now turn to the merits of the appeal.

## DISCUSSION

¶14 Did the District Court err when it allowed G.P.'s presumed paternity to be rebutted with genetic testing?

¶15 Appellants failed to preserve this issue for appeal when they did not object to the DNA testing at the hearing on J.D.'s Petition for Determination of Paternity. To properly preserve an issue for appeal, a party must notify the court at the time the objectionable conduct is at issue. *Jenks v. Bertelsen*, 2004 MT 50, ¶ 12, 320 Mont. 139, ¶ 12, 86 P.3d 24, ¶ 12. Untimely objections are not heard on appeal, as the time for correcting the error has passed. *State v. Vandersloot*, 2003 MT 179, ¶ 23, 316 Mont. 405, ¶ 23, 73 P.3d 174. ¶ 23. Failure to make a timely objection constitutes a waiver. *Hunt v. K-Mart Corp.*, 1999 MT 125, ¶ 10, 294 Mont. 444, ¶ 10, 981 P.2d 275, ¶ 10.

¶16 Here, C.P. and G.P. voluntarily waived the presumption of G.P.'s paternity when they failed to object to the District Court's order that the testing take place. Not only did they not object to the DNA testing, but they both agreed to participate, even while they must have known G.P. was not likely the father because he had a vasectomy years prior. Only after the District Court made its final determination in this case did Appellants object for the first time to the rebuttal of G.P.'s presumed paternity. We conclude that their failure to object at the hearing when the District Court ordered DNA testing constituted a waiver of Appellants' rights to appeal this issue.

7

**ISSUE TWO**

¶17    Did the District Court abuse its discretion when it determined it was in K.P.'s best interest to recognize J.D.'s paternity?

¶18    We review a district court's application of the "best interest of the child" standard and declaration of paternity for an abuse of discretion. *Matter of Paternity of Adam* (1995), 273 Mont. 351, 358, 903 P.2d 207, 211. A trial court abuses its discretion when it "act[s] arbitrarily without employment of conscientious judgment or exceed[s] the bounds of reason resulting in substantial injustice." *In re Paternity of C.T.E.-H.,* 2004 MT 307, ¶ 16, 323 Mont. 498, ¶ 16, 101 P.3d 254, ¶ 16 (citations omitted).

¶19    In *Paternity of Adam,* this Court explicitly adopted the "best interest of the child" standard for resolving paternity disputes under Montana's Uniform Parentage Act (UPA). 273 Mont. at 357, 903 P.2d at 211. Later, in *Girard v. Williams*, we reviewed the statutory framework set out in Montana's UPA by which the legal parent-child relationship may be established, and recognized that "once a paternity action is initiated under the UPA, a court may determine whether a judicial declaration of a father-child relationship would be in the best interests of a child," which declaration may also provide for visitation, support, and other provisions. 1998 MT 231, ¶ 21, 291 Mont. 49, ¶ 21, 966 P.2d 1155, ¶ 21, outlining §§ 40-6-109, 40-6-111 to 114 and 116, MCA, reiterated in *In re the Parenting of D.A.H.*, 2005 MT 68, ¶ 8, 326 Mont. 296, ¶ 8, 109 P.3d 247, ¶ 8.

¶20    This Court has consistently honored  the rights involved in relationships between natural parents and their children. We have also recognized that mere biology does not

8

automatically warrant the legal rights and responsibilities accompanying a determination of paternity. *Compare Girard*, 1998 MT 231, 291 Mont. 49, 966 P.2d 1155, (where we discussed the "best interest of the child" test's applicability to paternity disputes, and denied to non-parent caretakers the standing to challenge the natural father's request for custody of his two children who lived with the caretakers for an extended period while he was incarcerated), with *Paternity of Adam*, 273 Mont. 351, 903 P.2d 207, (where we affirmed that a judicial declaration of the natural father's paternity was not in the best interest of the child because the natural father did little to establish a parent-child relationship or provide care and support for his son despite financial ability and father's knowledge of paternity). In addition, we have relied on the U.S. Supreme Court's guidance as well. *See Paternity of Adam*, 273 Mont. at 354, 903 P.2d at 209, *Girard*, at ¶ 67 (in dissent), and *In re C.R.O.*, 2002 MT 50, ¶ 66, 309 Mont. 48, ¶ 66, 43 P.3d 913, ¶ 66 (in dissent), citing *Lehr v. Robertson* (1983), 463 U.S. 248, 103 S.Ct. 2985, 77 L.Ed.2d 614.

> The significance of the biological connection is that it offers the natural father an opportunity that no other male possesses to develop a relationship with his offspring. If he grasps that opportunity and accepts some measure of responsibility for the child's future, he may enjoy the blessings of the parent-child relationship and make uniquely valuable contributions to the child's development. If he fails to do so, the Federal Constitution will not automatically compel a State to listen to his opinion of where the child's best interests lie.

*Paternity of Adam*, 273 Mont. at 355, 903 P.2d at 209, quoting *Lehr*, 463 U.S. at 262, 103 S.Ct. at 2993-94, 77 L.Ed.2d at 627.

¶21    In Montana, biology is a "weighty factor" in applying the best interest standard, but not the "controlling consideration." *Paternity of Adam,* 273 Mont. at 357, 903 P.2d at 211.

9

Once a biological connection is established, a court must weigh that factor against other evidence of the parent's commitment to caring for the child, and fulfilling the role of a "parent" acting in the best interests of his child.

¶22 We require courts to evaluate specific criteria when determining the best interests of children in paternity disputes. In these cases, a court must consider: "the existence of a home environment; the stability of the present home and family; the extent to which uncertainty of parentage already exists in the child's mind; the efforts and commitments . . . the putative father has taken to establish supportive and financial ties with the child; as well as any other factors which may be relevant in assessing the potential benefits or detriments to the child." *Paternity of Adam*, 273 Mont. at 357-58, 903 P.2d at 211. A court's conclusion that a paternity declaration is in the best interest of a child must be based on facts in the record. *Paternity of Adam*, 273 Mont. at 357, 903 P.2d at 210-11 (citation omitted).

¶23 Here, the District Court evaluated the criteria sanctioned by this Court for determining a child's best interest, and relying on evidence in the record, determined that recognizing J.D.'s paternity was in K.P.'s best interest. We find no abuse of discretion in this decision. The record reflects that J.D. maintains suitable housing and appropriate furnishings to care for K.P.; J.D. provides a "stable and healthy home environment" for K.P; since before K.P.'s birth, J.D. has demonstrated a "full commitment to the responsibilities of parenting [her];" and J.D. remains employed, provides K.P. with medical insurance, and pays child support into a banking account in K.P.'s name.

10

¶24 Additionally, the District Court's determination of paternity comports with testimony provided at trial by the Family Court Director and K.P.'s GAL, both of whom opined a parent-child relationship between J.D. and K.P. would best serve her long-term well-being. The Director testified that it is in K.P.'s "best interests to have a relationship with her father, [J.D.]," and that children have an "innate need" to know their natural parents. K.P.'s GAL concluded that legally recognizing J.D.'s paternity, to immediately foster a meaningful relationship between K.P. and him, would serve K.P.'s best interests.

¶25 Further, the record reflects that throughout this dispute, J.D. has made consistent efforts to spend time with K.P. and develop a relationship with her. Despite C.P.'s and G.P.'s repeated efforts to stall and prevent visitation, J.D. consistently made his availability for visits known through counsel, arranged for the supervision of his visits with K.P. with the Nurturing Center when the District Court required it, and according to Family Services has "continually been on time for visits, been interested in visits, [and] acted appropriately at visits."

¶26 This case stands in stark contrast to *Paternity of Adam*, where the district court applied the same criteria for determining the child's best interest but issued the opposite ruling. In *Paternity of Adam,* the blood bond between Adam and the petitioner was undisputed, as here. However, in that case, the natural father "demonstrated no personal commitment to or responsibility for Adam," the father had neither suitable housing nor employment, and he failed to provide support of any kind. Adam's mother and her husband, on the other hand, shared a "strong emotional relationship" with Adam, a stable marital

11

relationship with each other, and provided Adam with financial stability in a safe and suitable home where Adam was "loved and well cared for." *Paternity of Adam*, 273 Mont. at 358, 903 P.2d at 211. We affirmed that a declaration of paternity in Adam's natural father, who had failed to perform as a parent, was not in Adam's best interest. Here, while C.P. and G.P. unquestionably provide K.P. with an excellent home, we must analyze what J.D. brings to K.P.'s life. J.D. has demonstrated the qualities of parenthood which warrant a judicial declaration of J.D.'s paternity, and which justify giving K.P. the opportunity to know and love her natural father.

¶27 Appellants maintain the U.S. Supreme Court's ruling in *Michael H. v. Gerald D.*, should control this Court. (1989), 491 U.S. 110, 109 S.Ct. 2333, 105 L.Ed.2d 91. We disagree. The seminal question addressed in *Michael H.* was whether the due process provisions of the U.S. Constitution grant a party other than a husband or wife the right to challenge the paternity of a child born to the wife. Appellants here correctly contend that, in keeping with the U.S. Supreme Court's ruling, neither the Constitution, nor the long-held social policy of protecting the legitimacy of children born to unitary families, offers natural fathers a vehicle for asserting paternity *where state law denies that opportunity*. However, the *Michael H.* Court expressly acknowledged that "it is a question of legislative policy and not constitutional law whether [a state] will allow the presumed parenthood of a couple desiring to retain a child conceived within and born into their marriage to be rebutted." 491 U.S. at 129-30, 109 S.Ct. at 2345, 105 L.Ed.2d at 110.

12

¶28 Montana's lawmakers have exercised their prerogative to allow the rebuttal of a husband's presumed paternity by third-parties to the marriage. In Montana, a husband is presumed to be the natural father of children born to his wife during their marriage. Section 40-6-105(1)(a), MCA. However, the husband's presumed paternity may be rebutted by a preponderance of evidence, or by blood test results which disprove his paternity. Section 40-6-105(3). Consequently, the U.S. Supreme Court's ruling upholding a California law, which prevented Michael H. and his natural daughter from challenging the presumed paternity of her mother's husband, has no bearing on this case.

¶29 C.P. and G.P. also contend that, despite the copious evidence relied on by the District Court, recognizing J.D.'s paternity still is not in K.P.'s best interest because J.D. did not pay medical expenses occasioned by K.P.'s delivery. Section 40-4-212(j), MCA, specifies that if a parent knowingly fails to pay birth-related costs the parent is able to pay, it is not in the child's best interest. However, payment of "birth related costs are non-exclusive factors to be considered with all factors when determining the best interests of the child." *Paternity of C.T.E.-H.*, ¶¶ 40-41. In weighing the evidence before it, the District Court determined that, on balance, sufficient evidence was presented to extend to J.D. the opportunity, uniquely afforded him by biology, to parent his child. We find no abuse of discretion by the District Court in making its determination.

## ISSUE THREE

¶30 Should this Court issue a stay of the District Court Order?

13

¶31    Because we conclude the District Court did not abuse its discretion when it declared J.D's paternity, and ordered the parties to devise a parenting plan that would allow for both visitation with, and support for, K.P, Appellants' request for a stay of the District Court Order is denied as moot.

## ISSUE FOUR

¶32    Is J.D. entitled to reasonable costs and attorney fees resulting from this appeal?

¶33    J.D. claims this appeal was intended to cause delay, and is an abuse of the judicial system.   He therefore seeks sanctions under Rule 32, M.R.App.P.   We disagree that Appellants' argument is so frivolous as to indicate bad faith.   Costs and attorney fees are therefore denied.

## CONCLUSION

¶34    For the foregoing reasons, we affirm the District Court ruling, deny the Appellants' motion for a stay of the District Court Order, and deny Respondent's request for costs and attorney fees on appeal.


/S/ PATRICIA O. COTTER


We Concur:

/S/ KARLA M. GRAY
/S/ W. WILLIAM LEAPHART
/S/ BRIAN MORRIS
/S/ JIM RICE

14