No. 05-344

IN THE SUPREME COURT OF THE STATE OF MONTANA

2006 MT 35

IN THE MATTER OF A.T.,

    Youth in Need of Care.

APPEAL FROM:    The District Court of the Eighth Judicial District,
In and For the County of Cascade, Cause No. ADJ 2002-183-Y,
Honorable Thomas M. McKittrick, Presiding Judge

COUNSEL OF RECORD:

    For Appellant:

        Carl B. Jensen, Jr., Cascade County Public Defender Office,
Great Falls, Montana (Attorney for Appellant Father)

    For Respondent:

        Hon. Mike McGrath, Montana Attorney General,
Mark W. Mattioli, Assistant Attorney General, Helena, Montana

        Brant S. Light, Cascade County Attorney,
Sarah Corbally, Deputy County Attorney, Great Falls, Montana

Submitted on Briefs:  November 30, 2005

Decided:  February 22, 2006

Filed:

_____
Clerk

Justice Patricia O. Cotter delivered the Opinion of the Court.

¶1     M.C. appeals the termination of his parental rights to his daughter, A.T.  We affirm.

## ISSUE

¶2     The issue on appeal is whether the District Court abused its discretion when it relied on evidence in the record rather than live testimony to terminate M.C.'s parental rights at a termination hearing for which M.C. failed to appear.

## FACTUAL AND PROCEDURAL BACKGROUND

¶3     A.T., the eight-year old child at issue in this case, has been in foster care and intensive therapy since September 2002 when she and her siblings were removed from the care of her mother, L.N. (Mother), and stepfather, B.N. (Stepfather).  A.T. met her father, M.C., only once before termination proceedings began.

¶4     On September 18, 2002, the State petitioned for emergency protective services and temporary legal custody of A.T. and her siblings.  Ultimately, Mother's parental rights were terminated by the District Court as a result of ongoing circumstances detrimental to the children, including drug abuse by Mother and Stepfather, unsanitary and unsafe conditions in the home, and exposure to explicit sexual behavior.  As a consequence of the abuse and neglect, A.T. began mimicking age-inappropriate sexual behavior both at home and at school, which required she be removed from her classroom and continuously monitored so as not to victimize other children.

2

¶5     On October 4, 2002, A.T. was adjudicated a Youth in Need of Care, and the District Court granted the State temporary legal custody of her. Department of Public Health and Human Services (DPHHS) social workers then located M.C. in California. M.C. had never been involved in A.T.'s life; in fact, his relationship with Mother ended before A.T.'s birth. In initial conversations with DPHHS social workers, M.C. expressed concern about his daughter's well-being. Consequently, DPHHS developed a treatment plan for M.C., the goals of which were for M.C. to establish a relationship with A.T., and to determine whether she could be placed in his care. On October 21, 2002, the District Court ordered M.C. to complete his treatment plan.

¶6     Over the next two years, M.C. communicated sporadically with DPHHS social workers, and A.T.'s Guardian ad Litem (GAL) and foster parents, keeping them apprised of his whereabouts as he moved frequently. Several times M.C. sent cards and photos for A.T. In March 2003, DPHHS sent a request for a home study to California, but before it could be completed, M.C. moved to Reno, Nevada. An attempt to evaluate M.C.'s Nevada home also failed; before the Nevada home study was completed M.C. moved back to California. Then, in April 2003, A.T.'s foster parents took her to Soquel, California to meet M.C. and visit his home, a remote one-room cabin in the mountains. Throughout this period, M.C. failed to meet the goals set forth by his court-ordered treatment plan.

¶7     On June 4, 2004, A.T.'s social worker informed DPHHS that A.T. was beginning to dissociate, and that permanent placement for her was critical. In conversations with A.T.'s social workers and foster parents, M.C. expressed concerns about his ability to meet A.T.'s

3

special needs, including regular therapy and supervised schooling. A.T.'s foster parents also voiced concerns that the location and spare condition of M.C.'s home would impede A.T.'s schooling and progress in therapy. These factors, combined with M.C.'s continued failure to adhere to his treatment plan, led social workers to discuss relinquishment of A.T. with M.C. on June 14, 2002. M.C. agreed that, though it would be difficult for him, relinquishment would be the best thing he could do for A.T. M.C. then assented to sign the necessary paperwork. DPHHS sent relinquishment documents by certified mail, and on June 30, 2004, obtained verification that M.C. had received them. However, the documents were not returned to DPHHS. Messages left at M.C.'s then-current phone number were not returned.

¶8      On August 31, 2004, M.C. left a voicemail for A.T.'s GAL saying he was moving to Sacramento, California. Then on September 14, 2004, M.C. left another message relaying his phone number there. DPHHS contacted M.C. on September 20, 2004; he gave no address when asked. This was the last communication between M.C. and anyone involved in A.T.'s case prior to this appeal. On October 8, 2004, the District Court appointed counsel to represent M.C. in termination proceedings initiated by the State.

¶9      Five months later, on March 23, 2005, the District Court held a hearing to consider Termination of Parental Rights and approval of a Permanency Plan for A.T.'s care. At that time A.T. had been in foster care for two and a half years with foster parents who hoped to adopt her. M.C. had failed to meet the goals necessary to determine whether granting him custody of A.T. would be appropriate, and he had not communicated with the State for over six months. The State was unable to locate M.C. at either of his two last-known addresses,

4

and consequently published notice of the termination hearing in keeping with statutory requirements. M.C. failed to attend the hearing. However, his court-appointed attorney was present.

¶10    At the termination hearing, the District Court chose not to receive live testimony. The District Court had presided over A.T.'s case from the time she was removed from Mother's care, and had its own extensive record to guide its determination. The District Court asked for M.C.'s position regarding termination, to which his counsel responded, "Your honor, we have had no contact with [M.C.] and therefore have no position."

¶11    The District Court concluded that based on clear and convincing evidence, M.C. had abandoned A.T. In addition, the court found that A.T. was a youth in need of care whose father had failed to complete any goal of his court-ordered treatment plan, and that conditions rendering M.C. unfit were unlikely to change within a reasonable time. Based on these findings, the District Court terminated M.C.'s parental rights to A.T.

## STANDARD OF REVIEW

¶12    The decision to terminate parental rights is soundly within the discretion of the district court and will not be overturned absent an abuse of discretion. *In re M.O.*, 2003 MT 4, ¶ 10, 314 Mont. 13, ¶ 10, 62 P.3d 265, ¶ 10 (citation omitted). In determining whether the district court's discretion has been properly exercised, we review the court's findings of fact to determine whether they are clearly erroneous, and its conclusions to determine whether they are correct. *In re M.O.*, ¶ 10 (citation omitted).

## DISCUSSION

¶13   Did the District Court abuse its discretion when it relied on evidence in the record rather than live testimony to terminate M.C.'s parental rights?

¶14   M.C. contends the District Court violated § 41-3-609(1), MCA, when it declined to hear live testimony before terminating M.C.'s parental rights at the March 23, 2005 termination hearing. Section 41-3-609(1), MCA, allows district courts to terminate parental rights "upon a finding established by clear and convincing evidence" that a child has been: (1) abandoned, or (2) has been adjudicated a youth in need of care, her parent has failed to comply with court-ordered treatment, and conditions rendering the parent unfit are unlikely to change in a reasonable time, among other provisions. M.C. urges this Court to require live testimony as the underpinning for a district court's finding of "clear and convincing evidence" to support termination of parental rights. M.C. cites *In re M.O.* for the prospect that his failure to object to termination at the termination hearing is immaterial in this case. 2003 MT 4, 314 Mont. 13, 62 P.3d 265. We disagree.

¶15   To properly preserve an issue for appeal, a party must notify the court at the time the objectionable conduct is at issue. *In re Parenting of K.P.*, 2005 MT 297, ¶ 15, 329 Mont. 337, ¶ 15, 124 P.3d 1091, ¶ 15 (citation omitted). Untimely objections are not heard on appeal, as the time for correcting the error has passed. *Parenting of K.P.*, ¶ 15 (citation omitted). Failure to make a timely objection constitutes a waiver of the party's right to appeal. *Parenting of K.P.,* ¶ 15 (citation omitted). Here, M.C. failed to appear at the termination hearing; therefore, he waived his right to testify. Moreover, his attorney did not object to termination.

6

¶16    We distinguish the facts here from the circumstances in *In re M.O.*, where we determined the mother's failure to object to termination of her parental rights was excusable. 2003 MT 4, 314 Mont. 13, 62 P.3d 265.  The record in that case was riddled with procedural missteps by the district court.  First, the district court held a hearing on April 3, 2000, to assess the need for an extension of DPHHS's temporary investigative authority (TIA) into the mother's care of her children.  *In re M.O.,* ¶ 18.  The district court opened the hearing by correctly stating it was a TIA review hearing, but then proceeded beyond the scope of the review to grant DPHHS temporary custody of mother's children.  The *pro se* mother did not object.  This Court noted that had mother been represented, counsel likely would have recognized and brought to the district court's attention its mistaken shift from TIA review to custody determinations.  Second, putting aside the mischaracterization of the hearing, the district court's termination of mother's parental rights was also erroneous because no testimony was given to establish that mother's children were youths in need of care, a statutory prerequisite to termination. Section 41-3-404, MCA, governs youth in need of care determinations and specifically requires a court to "hear evidence" during adjudicatory proceedings.  Most significantly, the *In re M.O.* district court later relied on the TIA review hearing as justification for terminating mother's parental rights, erroneously concluding that mother's children had been adjudicated youths in need of care at that time.  We held that the children had never been so adjudicated, and therefore termination of parental rights was unlawful.  *In re M.O.,* ¶ 19.

¶17    Throughout the muddied proceedings in *In re M.O.*, mother failed to object to the district court's missteps, and therein arguably failed to preserve her right to appeal. Given the extraordinarily confusing nature of her April 2000 hearing, however, and the misinformation repeatedly provided to mother by the district court, we determined that mother's appeal was properly before us.

¶18    Here, however, the record reflects that the District Court adhered to the procedural requirements necessary to properly terminate M.C. parental rights. Further, M.C. had every reason to know the consequences of the March 23, 2005 termination hearing. The District Court had previously adjudicated A.T. a youth in need of care based on testimony presented at trial in keeping with statutory requirements. M.C. was represented by counsel during termination proceedings where, with counsel's assistance, he could have asserted his rights and ability to parent A.T. The nature of the March 23, 2005 termination hearing was neither misrepresented to M.C., nor confused by the District Court or the parties involved. Instead, every effort was made to contact M.C. so as to provide him opportunity to assert his parental rights. M.C. failed to avail himself of that opportunity. We therefore decline to allow M.C. the extraordinary relief we extended to the mother in *In re M.O.*

¶19    In *In re T.E.*, we recognized that requiring litigants to object to asserted statutory violations in the district court not only preserves issues for appeal, but also serves the "greater" purposes of preserving the integrity of district court proceedings and discouraging prolonged litigation in child cases. 2002 MT 195, ¶ 23, 311 Mont. 148, ¶ 23, 54 P.3d 38, ¶ 23. "A district court cannot correct statutory deficiencies if those concerns are not brought

8

to its attention during the course of the proceeding, and for that reason, we have held that a district court will not be faulted for failing to address such issues." *In re T.E.*, ¶ 23 (citations omitted). Applying a different standard in child cases, as urged both in *In re T.E.* and here, "would encourage litigants to withhold objections in the district court, . . . ." ¶ 23. The ultimate consequence of such a policy would be protracted litigation, in "[direct] conflict with the primary consideration which the law gives to the child's best interest, and the requirement that child cases be expedited, so that cases can be resolved, and children can be provided permanent, caring home environments as soon as possible." *In re T.E.*, ¶ 23.

¶20     Finally, we note that A.T.'s best interests and need for permanent placement in a loving and stable home supersede M.C.'s interests here. "In determining whether to terminate parental rights, the district court is bound to give primary consideration to the physical, mental, and emotional conditions and needs of the [child], thus, the best interests of the [child] are of paramount concern in a parental rights termination proceeding and take precedence over the parental rights." *In re E.K.*, 2001 MT 279, ¶ 33, 301 Mont. 328, ¶ 33, 37 P.3d 690, ¶ 33 (internal quotations and citation omitted). A.T. now resides with foster parents who intend to adopt her. A.T.'s foster parents, with assistance from her therapists, teachers, and others, have provided her a stable home. On the other hand, M.C. has never participated in A.T.'s care, nor provided for her support. When offered assistance from DPHHS, M.C. failed to meet any of the goals necessary to establish a relationship with his daughter, cut off all communication with those involved in her care, and ultimately disappeared. Further, M.C. does not claim that he could have provided evidence at trial, or

9

can now provide evidence that he will love, care for, and support A.T. in a safe and stable home.

¶21   We conclude that, by failing to appear at the termination hearing, and failing to object either in person or by counsel to the manner in which the District Court conducted the termination hearing, M.C. has waived his right to appeal the District Court's decision to terminate his parental rights without taking evidence at the termination hearing. We stress that this decision is premised upon the unique circumstances presented here, and does not diminish the requirement that termination of parental rights rest on a finding of clear and convincing evidence.

## CONCLUSION

¶22   For the foregoing reasons, we affirm.


/S/ PATRICIA COTTER

We Concur:

/S/ W. WILLIAM LEAPHART
/S/ JOHN WARNER
/S/ BRIAN MORRIS
/S/ JIM RICE


Chief Justice Karla M. Gray dissenting.

¶23 I respectfully, but strenuously, dissent from the Court's opinion. The Court concludes, in ¶ 21, that M.C. waived his right to appeal from the termination of his parental rights based on his failure to object "in person or by counsel to the manner in which the District Court conducted the termination hearing." The sad fact is that no termination hearing occurred. The even sadder fact is that no one seems to care.

¶24 The District Court terminated M.C.'s parental rights based on findings of fact not supported by any testimony or other evidence presented at the so-called termination hearing. Rather than requiring DPHHS and the District Court to meet their statutory obligations prior to terminating parental rights, the Court creates yet another "exception" in what I perceive to be a long line of cases placing DPHHS in a "power" position. *See, e.g.*, *In re S.C.*, 2005 MT 241, ¶¶ 37-52, 328 Mont. 476, ¶¶ 37-52, 121 P.3d 552, ¶¶ 37-52 (Gray, C.J., concurring and dissenting); *In re D.A.*, 2003 MT 109, ¶¶ 34-39, 315 Mont. 340, ¶¶ 34-39, 68 P.3d 735, ¶¶ 34-39 (Gray, C.J., concurring and dissenting); *Inquiry into M.M.* (1995), 274 Mont. 166, 175-78, 906 P.2d 675, 680-82 (Gray, J., dissenting); *Matter of F.H.* (1994), 266 Mont. 36, 41-44,

11

878 P.2d 890, 894-95 (Gray, J., dissenting). I cannot agree. I would reverse and remand for further proceedings.

¶25 In my view, this case boils down to M.C.'s assertion that the District Court's findings are clearly erroneous because they are not supported by substantial credible evidence. The Court sets forth the "clearly erroneous" standard for reviewing findings in child abuse and neglect cases in ¶ 12, but does not apply it. Instead, the Court concludes, in ¶ 21, that M.C. waived his right to appeal from "the District Court's decision to terminate his parental rights without taking evidence[.]" I am unaware of any authority requiring a party to assert at a hearing or trial that the evidence is insufficient to support findings the district court has yet to make. In an "ordinary" civil case, I am convinced this Court would readily review—absent any objection at trial—an assertion that a district court's findings are clearly erroneous because the trial court did not first receive evidence. Meaningful review of such an error is even more critical in a child abuse and neglect case, where both the parent's rights and the child's best interests are at stake.

¶26 A parent's right to the care and custody of his or her child is a fundamental liberty interest which must be protected by fundamentally fair procedures. *In re T.H.*, 2005 MT 237, ¶ 22, 328 Mont. 428, ¶ 22, 121 P.3d 541, ¶ 22 (citation omitted). Section 41-3-609(1), MCA, generally provides that a district court may terminate a parent-child legal relationship "upon a *finding* established by *clear and convincing evidence*" that one of several delineated circumstances exists. (Emphasis added.) The caption of § 41-3-607, MCA, "[p]etition for termination—separate hearing—no jury trial," illustrates that a hearing on the merits of a

12

petition for termination of parental rights is required.

¶27 Section 41-3-422(5)(a)(iv), MCA, requires that "the person filing the abuse and neglect petition has the burden of *presenting evidence* required to justify the relief requested" and establishing "*clear and convincing evidence* for an order terminating the parent-child legal relationship." (Emphasis added.) "'Proof' is the establishment of a fact by evidence." Section 26-1-101(4), MCA. "'Evidence' is the means of ascertaining *in a judicial proceeding* the truth respecting a question of fact, including but not limited to witness testimony, writings, physical objects, or other things presented to the senses." Section 26-1-101(2), MCA. (Emphasis added.)

¶28 In my opinion, § 41-3-609(1), MCA, requires a petitioner—here, DPHHS—to meet the requisite burden of proving a circumstance justifying termination *at the time of the required hearing*. It cannot do so without presenting evidence. Nor could the District Court enter legitimate findings absent clear and convincing evidence upon which to base such findings. Montana statutes require much more. To hold otherwise renders the requirement set forth in *In re T.H.*, ¶ 22, for "fundamentally fair procedures" prior to terminating a parent's fundamental liberty interest a mockery.

¶29 In this regard, the statement in the District Court's order that the court made findings "[b]ased upon the evidence and testimony presented" is, at the very least, an outright misrepresentation. DPHHS presented no evidence or testimony at the hearing. The representations by the attorney for DPHHS—that M.C. had been served by publication and the last contact between M.C. and DPHHS occurred in June—were not evidence. *See State*

13

*v. Stuart*, 2001 MT 178, ¶ 22, 306 Mont. 189, ¶ 22, 31 P.3d 353, ¶ 22 (citation omitted). Moreover, while the District Court could take judicial notice of prior proceedings, those proceedings—which generally involve a lesser burden of proof than termination proceedings—simply did not relieve DPHHS of its burden to present evidence at the termination hearing or the District Court of its obligation to base its findings on clear and convincing evidence from the termination hearing.

¶30    DPHHS filed various reports and affidavits throughout the course of the case, but did not present these documents in a manner affording M.C. the opportunity to cross-examine the documents' authors or register objections based on the Montana Rules of Evidence—an opportunity that, in my view, the statutes governing termination proceedings clearly contemplate.  Consequently, I reiterate my previously expressed position with respect to findings made at a different stage of the proceedings, that statements in an affidavit supporting a petition "simply are not evidence upon which a trial court can rely in making findings of fact" when a hearing is required. *See In re D.A.*, ¶ 38 (Gray, C.J., concurring and dissenting).  Moreover, in this case, facial inconsistencies and significant delays between the execution and filing of some documents make it especially clear that the documents cannot be considered "evidence."

¶31    Regarding the Court's discussion of A.T.'s best interests, I do not believe our recognition of a district court's obligation to give paramount consideration to the child's best interests is a legitimate basis for this Court to conclude a parent has waived the right to appeal from findings made without the presentation of evidence.  Nor is consideration of the

14

child's best interests appropriately invoked as a *post hoc* rationalization for a petitioner's utter failure to present, and a district court's utter failure to receive, evidence at a termination hearing on any matter—including the child's best interests.

¶32 I also am very troubled by the reliance of DPHHS and this Court on M.C.'s failure to personally appear at the hearing. The District Court did not enter, nor did DPHHS request, default judgment pursuant to § 41-3-429(4)(b)(vii), MCA, which requires service by publication to include notification of the possibility of default judgment. Indeed, I am unpersuaded that a default judgment could be authorized when, as here, counsel appears on behalf of a parent who does not personally appear.

¶33 In any event, this termination purportedly was based on the merits, and the petitioner—not the parent—has the burden of establishing whether the facts justify termination under § 41-3-609(1), MCA. Thus, contrary to the Court's statements in ¶ 18, M.C. was not required to "assert" his fundamental constitutional right to parent. Furthermore, neither the statutory definition of abandonment set forth in § 41-3-102(1)(a), MCA, nor the "treatment plan" criteria set forth in § 41-3-609(1)(f), MCA, provides that a parent's failure to personally appear constitutes a basis for involuntary termination. Those statutes clearly require a petitioner to "present" more than a parent's failure to personally appear in order to meet the requisite burden of proof.

¶34 I also disagree with the Court's statement, in ¶ 15, that counsel "did not object to termination." After the attorneys identified themselves, the entire termination proceeding consisted of the following:

15

[DPHHS attorney]: Your Honor, just for the record, the mother's parental rights to this child have been previously terminated by this court. And the state did have to publish notice for [M.C.], and we did publish that. And that was filed with the court.

So at this time we would just ask the court to terminate his parental rights based upon abandonment as well as failure of court ordered treatment. Court had ordered a treatment plan for him.

The state has had no contact with [M.C.] since—the last time the social worker spoke with him was June of 2004. We could not locate him to serve him at the two addresses that he had provided in the past. So that's why we ended up publishing. We can provide testimony if required.

The Court: Mr. Cushman?

[M.C.'s counsel]: Your Honor, we have had no contact with [M.C.] and therefore have no position.

The Court: State's motion is granted.

[DPHHS attorney]: Thank you, Your Honor.

First, the District Court's query to M.C.'s counsel did not seek a response to anything concrete. For the reasons stated above, the court's reply to the *statements* by the attorney for DPHHS should have been, "Proceed with your case, counsel." Read in context, M.C.'s counsel's response to the court is most reasonably construed as precisely what it was—a statement that, due to the lack of instruction on whatever the court's query was intended to be, he simply had "no position" on that query.

¶35 In any event, the Court advances no authority for the proposition that, absent a parent's actual relinquishment of parental rights pursuant to § 42-2-402(1), MCA, an attorney may "waive" a client's parental rights or the statutory requirements that a petitioner present evidence and meet the requisite burden of proof for involuntary termination, as set forth in §§

16

41-3-422(5)(a)(iv) and -609(1), MCA. The notion that attorneys have such power is, in my view, inconceivable.

¶36    Finally, I note DPHHS's argument—in response to M.C.'s request for a hearing complying with statutory requirements—that "[t]he purpose of a remand is to remedy a substantial injustice, not to elevate form over substance." As I have in the past, I observe again that this type of statement reflects "the untenable attitude which seems to permeate DPHHS, or at least its counsel, in these appeals." *See In re Custody and Parental Rights of D.S.*, 2005 MT 275, ¶ 50, 329 Mont. 180, ¶ 50, 122 P.3d 1239, ¶ 50 (Gray, C.J., concurring). Importantly, in this case the error at issue is the very lack of any substance in the termination proceeding.

¶37    I would conclude the District Court's findings are clearly erroneous and M.C. did not waive the right to appeal. I would remand for a termination hearing.

¶38    I dissent.

/S/ KARLA M. GRAY

Justice Jim Nelson joins in the foregoing dissenting opinion of Chief Justice Gray.

/S/ JAMES C. NELSON