FILED

03/25/2020

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 19-0231

DA 19-0231

IN THE SUPREME COURT OF THE STATE OF MONTANA

2020 MT 64

IN THE MATTER OF:

A.B.,

     A Youth in Need of Care.

APPEAL FROM:    District Court of the Fourth Judicial District,
In and For the County of Missoula, Cause No. DN-16-159
Honorable John W. Larson, Presiding Judge

COUNSEL OF RECORD:

     For Appellant:

     Shannon Hathaway, Montana Legal Justice, PLLC, Missoula, Montana

     For Appellee:

     Timothy C. Fox, Montana Attorney General, Katie F. Schulz, Assistant
Attorney General, Helena, Montana

     Kirsten Pabst, Missoula County Attorney, Diane Conner, Deputy County
Attorney, Missoula, Montana

Submitted on Briefs:  January 22, 2020

Decided:  March 24, 2020

Filed:

                    _____
                         Clerk

Justice Beth Baker delivered the Opinion of the Court.

¶1   R.B. ("Mother") appeals the order of the Fourth Judicial District Court, Missoula County, terminating her parental rights to her son, A.B.  Mother argues that the District Court erred in concluding that her conduct was unlikely to change within a reasonable time and in finding that termination of parental rights, rather than guardianship, was in A.B.'s best interests.  We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

¶2   On October 5, 2016, probation officers arrived at the house of A.B.'s birth father ("Father") to arrest him for a probation violation.  The officers reported to the Department of Child and Family Services ("Department") that Father[1] and Mother's infant son, A.B., was present during drug use, that Mother had used morphine that day, and that Mother had a loaded syringe on the bathroom counter.  The Department determined that A.B. was in immediate danger due to both parents demonstrating "out of control behavior due to their addictive drug use" and because A.B. was an "extremely vulnerable child due to his age and dependence on his caregivers to meet all of his basic needs."  A.B. was eleven months old at the time.  Mother stated that her mother, D.F. ("Grandmother"), could care for A.B. and that she had left A.B. with Grandmother in the past.  The Department implemented a 30-day voluntary out-of-home protection plan that placed A.B. with his Grandmother and required Mother to submit to weekly urinalysis ("UA") testing, obtain a

---

[1] Father relinquished and the District Court terminated his parental rights on February 6, 2019. Because termination of Father's parental rights is not at issue in this appeal, we discuss the facts relevant to the termination of Mother's parental rights.

chemical dependency evaluation, and maintain contact with the investigating Child Protection Specialist ("CPS").

¶3 On November 4, 2016, the Department filed a petition for adjudication of youth in need of care and a petition for temporary legal custody. Mother was admitted to Family Drug Treatment Court ("Treatment Court"). The Treatment Court ordered Mother to obtain a chemical dependency evaluation; abstain from using alcohol or unprescribed drugs; and submit to random UA testing. The District Court adjudicated A.B. a youth in need of care, granted the Department temporary legal custody, approved interim treatment plans, and ordered Mother to complete UA testing. Mother obtained a chemical dependency evaluation on December 27, 2016. The evaluator recommended inpatient treatment due to Mother's long-term use of morphine and methamphetamine. The Treatment Court assisted Mother in applying to Recovery Center Missoula, a chemical dependency center.

¶4 At a status hearing in January 2017, Grandmother reported that Mother was doing well and that A.B. interacted very well with her. The court noted that Mother had missed several UAs and that those she provided were consistently positive for methamphetamine. At a status hearing in April 2017, Grandmother reported that Mother was undergoing inpatient treatment, had detoxed, and was actively participating in the treatment. Grandmother also reported that A.B. was doing well.

¶5 The District Court approved Mother's treatment plan on May 3, 2017. The treatment plan required Mother to complete parenting classes; regularly attend supervised and unsupervised visits with A.B.; attend addictions counseling and follow the

recommendations of the chemical dependency evaluator; not use or possess any alcohol or unprescribed drugs; submit to random substances testing; and avoid exposing A.B. to any alcohol or drugs.

¶6 The court extended temporary legal custody to the Department and would do so throughout the proceedings. Between May and July 2017, Mother was discharged from inpatient treatment for noncompliance. She began using methamphetamine again and missed UAs. The District Court emphasized that it was important for Mother to visit A.B. despite her relapse. Mother then began another outpatient treatment program but stopped participating within a month. Mother was suspended from Treatment Court due to missed UA testing and failure to appear for a hearing. In mid-August 2017, Mother stopped seeing Diane McLaverty, her therapist at Courage to Change Missoula. In September 2017, Mother reported she had reengaged in treatment and was visiting A.B. However, Mother had not submitted to UAs and the District Court warned her that she needed to commit to treatment and visits by the end of October 2017. A.B.'s Court Appointed Special Advocate ("CASA") reported that Grandmother believed Mother was still using illegal drugs. Grandmother continued facilitating visits with Mother and A.B. for some time, but by late September, Mother stopped attending visits.

¶7 The Department filed a Motion to Approve Permanency Plan on November 9, 2017. In the motion, the Department indicated that A.B. was placed with Grandmother, that he was well-bonded, had no special needs, and was happy and excited when he saw Mother. The Department also stated that Mother no longer was completing UAs, was still using substances, and saw A.B. only occasionally. The Permanency Plan called for reunification

4

with Mother if she successfully completed the treatment plan within a reasonable time and if reunification was in A.B.'s best interests. It simultaneously called for adoption if reunification was not in the best interests of A.B. The Permanency Plan did not mention guardianship as an option.

¶8 On January 11, 2018, the Department reported that Mother was again visiting A.B. regularly. The Department informed the court that A.B. had been out of his parents' care for over fifteen months, giving rise to a presumption that termination was in A.B.'s best interests, but the Department requested an exception to the presumption for "two or, at most, three months to see if we can work with the mother and see if we can give some additional time to work on reunification." The District Court granted the exception and acknowledged that A.B. was doing well in his placement, was not suffering, and that the extension would give Mother an "extra opportunity" for reunification.

¶9 Mother continued to test positive for methamphetamine. Mother's counselor again recommended she attend inpatient treatment. At a March 2018 status hearing, the District Court encouraged Mother to engage in her treatment plan and consider all inpatient treatment opportunities. Grandmother stated that she believed Mother was using drugs but was doing well with her visits and had continued to participate in parenting coaching. The District Court stated at the status hearing that its inclination was to "go to a guardianship in this thing" and that guardianship would be an incentive for Mother to "fully perform all of the parenting obligations that are outlined."

¶10 Mother continued to test positive for methamphetamine through July 2018. A second chemical dependency evaluation observed that despite Department intervention and

5

the offered outpatient treatment, Mother continued to use drugs. The evaluation concluded that if Mother did not participate in a structured treatment environment, she would remain at high risk to continue using. The counselor recommended that Mother complete inpatient treatment, which she did not do.

¶11 On August 22, 2018, the Department filed a petition to terminate parental rights ("Termination Petition") requesting permanent legal custody of A.B. with the right to consent to adoption. The Department asserted that Mother had continued to use methamphetamine and failed to seek inpatient chemical dependency treatment; that Mother's conduct or condition rendered her unfit or unwilling to provide adequate parental care to A.B.; and that the conduct or condition was unlikely to change in a reasonable amount of time. It requested that A.B.'s Permanency Plan be amended to include adoption by Grandmother and stated that the amended plan would be in A.B.'s best interests. The Department asserted that adoption would ensure that A.B.'s physical, emotional, and medical needs would be met in the future. The Department did not support guardianship, stating it would "undermine the idea of permanency for [A.B.], given his very young age and circumstances." All other parties voiced objections to the Termination Petition, as well as to the Department's proposed amended plan.

¶12 In October 2018, the CASA reported that A.B. continued to do well in Grandmother's care and that there were no concerns for A.B.'s physical or mental development. The CASA stated, "This CASA believes reunification with the child is not in the child's best interest." The CASA reported concern that the Department would terminate Mother's parental rights and believed it was in A.B.'s best interests to remain

6

with his Grandmother under guardianship, noting it would mean "hope" for Mother's recovery.

¶13 Mother continued to avoid UAs and test positive for methamphetamine throughout the following months. Her counselor again upgraded her level of recommended chemical dependency treatment from outpatient to inpatient. She was placed on probationary status with the Treatment Court due to noncompliance and ultimately did not attend inpatient treatment.

¶14 Mother, Father, and Grandmother filed a joint brief in support of a private guardianship, asserting that Grandmother could maintain a positive and safe relationship between A.B. and Mother as she had done for two years.

¶15 The District Court conducted the termination hearing on February 6, 2019. The court heard testimony from Mother; Darren Ashby, a licensed addictions counselor; CPS Kate Larcom, Child and Family Services Child Welfare Manager; Candace Miera, Licensed Addictions Counselor with the Recovery Center; Rylie Shade, visit coach with Evolution Services; CPS Miranda Sanderson; Mother's sister; and Grandmother.

¶16 Mother testified that A.B. had been living and doing well in Grandmother's care for two years and that she signed a consent for Grandmother to have guardianship of A.B. She acknowledged that she continued to use methamphetamine and only submitted one clean UA sample in May 2018. She stated that she did not "believe inpatient [treatment] would be the right fit" for her; she was doing the work she was supposed to do, just "not in the time frame that was allotted." Mother stated that she preferred guardianship over

7

termination, that she and Grandmother co-parented very well, and that if Grandmother was unavailable to parent, then Mother's sister would fill in that role as co-guardian.

¶17   Rylie Shade, a visit coach at Evolution Services who worked with Mother to improve her parenting skills, stated that Mother attended nearly all of her supervised visits with A.B. and showed great progress with her parenting.  Shade believed that Mother was able to meet A.B.'s emotional and physical needs and that they had a "very special bond." She testified that if Mother reported that she was using, she would not go to Grandmother's house to be around A.B.  She testified that she and Mother had many conversations regarding her use of methamphetamine and how that could affect A.B.  She testified that a large concern for her was that Mother needed to see A.B. more consistently, and that when Mother was using, she would not visit her son.  She believed a guardianship would be in A.B.'s best interests instead of termination.  She testified that A.B. and Grandmother had a strong bond and that Grandmother would put A.B.'s needs first, even if that contrasted with Mother's wishes.

¶18   Regional CPS Supervisor Kate Larcom testified that she had supervised the social workers assigned to Mother's case since December 2016 and participated in ongoing decision-making meetings concerning A.B.'s Permanency Plan.  Based on her experience and discussions with the CPSs, the Department determined that it was in the best interests of A.B. to proceed with adoption in the Permanency Plan.  CPS Larcom testified that when the Department determined that adoption was preferable to guardianship, it assessed substantial relationships, A.B.'s age, A.B.'s wishes, the parents' wishes, the need for a subsidy, and the needs of A.B., as outlined in the CFS manual.  According to CPS Larcom,

8

adoptions are more permanent than guardianships and do not leave A.B.'s placement open to litigation to dissolve a guardianship, thus providing A.B. with stability. Adoptions also have the potential to provide financial assistance that guardianships do not. CPS Larcom testified that she had experience where youths were involved in guardianships. She stated that she had seen how litigation surrounding guardianships impacts children and that foster children often feel they have little voice in their permanency plans. CPS Larcom testified that if proceedings to dissolve a guardianship are initiated, the Department comes back into the picture and further disrupts the children's lives with renewed evaluations and interference.

¶19 The Department believed that adoption was in A.B.'s best interests because Mother had ample opportunities to complete her treatment plan and had not been successful. CPS Larcom testified that the parents' and Grandmother's focus for requesting guardianship was based on Mother's needs and not necessarily A.B.'s best interests. CPS Larcom explained that Grandmother expressed that she was concerned that termination, rather than guardianship, would impact Mother's mental health and she feared Mother would overdose. According to the Department, "what's in the child's best interests is different than what the family feels is in the child's best interests. And I believe it's – they're looking out for what's in the family's best interests, which is absolutely within their role and that's where the – discrepancy is." According to CPS Larcom, if the Department had the facts to support a guardianship, it already would have done so.

¶20 CPS Miranda Sanderson, the social worker assigned to A.B.'s case since 2017, also testified at the termination hearing and agreed with CPS Larcom. CPS Sanderson

explained that Mother failed to complete her treatment plan and, in her opinion, would not make the required changes in a reasonable period of time to address her methamphetamine use and to safely parent A.B. She also believed that the motivation behind guardianship was concern for Mother and not for A.B.'s best interests. She further testified that granting a guardianship would continue to enable Mother and reward her for not following the treatment plan. She testified that she saw no motivation from Mother to parent full-time because of her drug use. She testified that she believed A.B. needed permanency, and adoption by Grandmother was the only form of permanency she recommended because there were too many unknowns with guardianship.

¶21 Grandmother and Mother's sister testified in favor of guardianship. Grandmother stated that it was important for Mother to continue to try to parent, and that was why guardianship was preferable to termination of Mother's parental rights. Grandmother testified that Mother and A.B. were absolutely bonded and Mother "truly has A.B.'s best interests at heart despite the fact that she is encompassed with addiction." She did not think that Mother would subject A.B. to litigation in a guardianship. She testified that she had already provided A.B. with a sense of permanency and would continue to do so. She said that she was financially capable of supporting him, and she wanted a guardianship instead of termination of Mother's rights.

¶22 On March 18, 2019, the District Court issued its findings of fact, conclusions of law, and order terminating Mother's parental rights and granting the Department permanent legal custody with the right to consent to adoption. The court found that the Department made reasonable efforts to finalize the Permanency Plan, including developing treatment

10

plans for Mother and offering her evaluations and services.  The court found that Mother was still using methamphetamine, had twenty-one months to comply with her court-approved treatment plan, and did not comply.  The court found that the excessive use of methamphetamine affected Mother's ability to care and provide for the child and that it was unlikely to change within a reasonable time.

## STANDARDS OF REVIEW

¶23    This Court reviews a district court's termination of parental rights for an abuse of discretion. *In re R.J.F.*, 2019 MT 113, ¶ 20, 395 Mont. 454, 443 P.3d 387 (citing *In re A.S.*, 2016 MT 156, ¶ 11, 384 Mont. 41, 373 P.3d 848).  This Court will not disturb a district court's decision on appeal unless "there is a mistake of law or a finding of fact not supported by substantial evidence that would amount to a clear abuse of discretion." *In re D.B.*, 2012 MT 231, ¶ 17, 366 Mont. 392, 288 P.3d 160.  An abuse of discretion occurs when the district court acted arbitrarily, without employment of conscientious judgment, or exceeded the bounds of reason resulting in substantial injustice. *In re D.B. & D.B.*, 2007 MT 246, ¶ 16, 339 Mont. 240, 168 P.3d 691.  A district court has abused its discretion if its findings of fact are clearly erroneous or its conclusions of law are incorrect. *In re D.B.*, ¶ 16.  "A factual finding is clearly erroneous if it is not supported by substantial evidence, if the court misapprehended the effect of the evidence, or if review of the record convinces the Court a mistake was made." *In re J.B.*, 2016 MT 68, ¶ 10, 383 Mont. 48, 368 P.3d 715.

11

## DISCUSSION

¶24 A district court may order the termination of the parent-child legal relationship if there is clear and convincing evidence that the child was adjudicated a youth in need of care, that the parent failed to comply with an appropriate treatment plan, and if the condition or conduct that rendered the parent unfit is unlikely to change within a reasonable time. Section 41-3-609(1)(f), MCA. When considering any of the relevant factors in determining the likelihood of that change, the court must give primary consideration to the physical, mental, and emotional conditions and needs of the child. Section 41-3-609(3), MCA.

¶25 Mother argues that the District Court erred in terminating her parental rights because the Department failed to prove by clear and convincing evidence that every requirement of the termination statute has been satisfied. She argues that: (1) the District Court erroneously concluded that Mother's conduct was unlikely to change within a reasonable time; and (2) it was not in A.B.'s best interests to terminate Mother's parental rights because substantial evidence showed that guardianship was in A.B.'s best interests.

¶26 *1. Did the District Court err when it found that the conduct or condition rendering Mother unfit to parent was unlikely to change within a reasonable time?*

¶27 To determine that the condition or conduct that rendered a parent unfit is unlikely to change within a reasonable time, thus supporting termination, the court must find that the parent's conduct or condition renders the parent unfit, unable, or unwilling to give the child adequate parental care. Section 41-3-609(2), MCA. The court should consider the excessive use of a narcotic or dangerous drug that affects the parent's ability to care and

12

provide for the child. Section 41-3-609(2)(c), MCA. Under this statute, the question is not merely whether a parent has made progress or would make some progress in the future, but whether the parent is likely to make enough progress within a reasonable time to overcome the circumstances rendering her unfit to parent. *In re D.F.*, 2007 MT 147, ¶ 43, 337 Mont. 461, 161 P.3d 825 (citing § 41-3-609(1)(f)(ii), MCA). To determine whether the conduct or condition is likely to change, the court is "required to assess the past and present conduct of the parent. We do not have a crystal ball to look into to make this determination, so it must, to some extent, be based on a person's past conduct." *In re S.C.L.*, 2019 MT 61, ¶ 9, 395 Mont. 127, 437 P.3d 122 (citations omitted).

¶28   Mother had many conversations with the court and with her counselors regarding her methamphetamine use and how it affected her ability to parent. Mother stated that when she was using, she would not visit A.B., and other testimony confirmed this. She admits that although she continued to struggle with relapse, she was honest about her relapses and showed that she wanted to continue to try to parent. Shade, Mother's parenting coach from Evolution Services, testified that Mother was successful in her parenting abilities, and Grandmother testified that Mother and A.B. had a good bond and that Mother would visit frequently.

¶29   The District Court found that Mother continued to use methamphetamine and did not successfully attend inpatient treatment as recommended by her counselors. The District Court granted an extension to allow Mother to work on her treatment, noting "we're giving Mother an extra opportunity." However, Mother had only one clean UA in over two years of Department involvement despite the various evaluations, counseling, and

inpatient treatment offered to her. The evidence showed that when Mother was using, she avoided visiting A.B. The District Court did not clearly err by finding clear and convincing evidence that the conduct or condition rendering Mother unfit to parent was unlikely to change within a reasonable time.

¶30 *2. Did the District Court abuse its discretion when it found that Mother did not overcome the presumption that termination was in A.B.'s best interests and terminated her parental rights instead of granting guardianship?*

¶31 If a child is out of the home for fifteen of the most recent twenty-two months, the Department must file a petition for termination unless a specific exception applies. Sections 41-3-604(1)(a)-(c), MCA. Mother argues that she is entitled to the exception in (1)(a), which eliminates the mandatory filing if the child is being cared for by a relative. But as the Department argues and we have held, it retains discretion to file even when an exception applies. *See In re C.W.E.*, 2016 MT 2, ¶¶ 14-15, 382 Mont. 65, 364 P.3d 1238.

¶32 There is a presumption that termination is in the child's best interests if the child has been in an out-of-home placement for fifteen out of the most recent twenty-two months. Section 41-3-604(1), MCA. The parties do not dispute that the presumption has arisen. A.B. was in out-of-home placement with Grandmother for almost all of the most recent twenty-two months when the Department filed its Termination Petition.

¶33 The District Court found that Mother did not overcome the presumption that termination of her parental rights was in A.B.'s best interests based on Mother's extensive history of drug use and her failure to make sufficient progress in her treatment plan. The court found, based on the testimony presented, that Mother was unwilling to address her addiction and its impact on her ability to parent A.B. The court found that Mother failed

14

to complete the recommended inpatient chemical dependency treatment and did not achieve and maintain sobriety. The Court considered A.B.'s need for a stable, consistent, and safe primary caregiver and determined that Mother could not provide that role for A.B. within a reasonable time, and it was not persuaded that guardianship was in A.B.'s best interests.

¶34 The District Court found that it was in A.B.'s best interests to terminate Mother's parental rights. It considered CPS Larcom's testimony that adoption grants greater stability to the child because there is no future risk of litigation over guardianship. It found further that Mother had not given priority to A.B.'s stability and permanency and concluded that A.B. should not be left subject to Mother's right to challenge his placement in the future. The court weighed the evidence before it and found that granting guardianship without terminating Mother's parental rights would "subordinate the child's needs for permanency to meet the mother's timeline of becoming able to parent sometime in the next 15 years, which is not reasonable."

¶35 Mother asserts that overwhelming evidence showed that termination was not in A.B.'s best interests because he was in a stable, safe placement with Grandmother; Mother maintained consistent visits with A.B.; Mother and A.B. had a significant bond; and the family and other witnesses testified against termination. Mother argues that the Department failed to present testimony or evidence demonstrating her substance use negatively impacted A.B. She asserts that the court failed to consider this evidence, instead focusing on Mother's failure to maintain sobriety and engage in treatment. Mother argues

15

that the District Court erred when it found that the only form of permanency was through adoption and instead asserts that A.B.'s best interests would be served by guardianship.

¶36 Finally, Mother asserts that the District Court failed to consider the credible testimony in support of guardianship presented by the CASA, Shade, and the family. Mother asserts that the Department's witnesses who testified that termination was in A.B.'s best interests based their testimony on generalities regarding Mother's methamphetamine use, the general possibility that A.B. may need financial support in the future, and the possibility that a guardianship may subject A.B. to future litigation. She points to the testimony that A.B.'s health and safety needs were being met by Grandmother and that the family desired guardianship.

¶37 The Department contends that the District Court correctly applied the presumption in favor of termination and that Mother did not overcome that presumption. The Department argues that the request for guardianship was really an argument that guardianship was better for Mother, not for A.B. CPSs Larcom and Sanderson both testified that the Department discussed guardianship and termination as options, ultimately deciding to pursue termination because, in their view, the parties were seeking guardianship for Mother's best interests, not for A.B.'s. The Department asserted that it was in A.B.'s best interests to terminate parental rights because of Mother's continued drug use and failure to make sufficient progress in her treatment plan. It asserted that Mother was not able to meet A.B.'s basic needs. The Department's role is to determine what is best for the child, not what is best for the family, and the Department believed that adoption was more in A.B.'s best interests based on the CPSs' experience.

16

¶38 "Children cannot always afford to wait for their parents to be able to parent." *In re L.S.*, 2003 MT 12, ¶ 15, 314 Mont. 42, 63 P.3d 497. We have held that if a district court finds the statutory criteria supporting termination are met, "no limitation requires the district court to consider other options prior to terminating parental rights." *In re T.S.*, 2013 MT 274, ¶ 30, 372 Mont. 79, 310 P.3d 538. "[T]he statute's permissive language gives district courts discretion in deciding whether to terminate parental rights." *In re C.M.*, 2015 MT 292, ¶ 35, 381 Mont. 230, 359 P.3d 1081. A child's need for a permanent, stable, and loving home supersedes a parent's right to parent the child. *In re D.A.*, 2008 MT 247, ¶ 21, 344 Mont. 513, 189 P.3d 631 (citing *In re A.T.*, 2006 MT 35, ¶ 20, 331 Mont. 155, 130 P.3d 1249).

¶39 The District Court thoughtfully considered guardianship as well as termination and ultimately determined that termination and adoption were in A.B.'s best interests. This was supported by the court's experience with Mother for the prior three years, testimony regarding guardianship and its challenges, and its determination that Mother and Grandmother sought guardianship for Mother's needs, not for A.B.'s. This determination, based on the record before it, was within the court's discretion.

¶40 Based on its history with the case, its familiarity with the family through the years of court proceedings, and the testimony it received at the termination hearing, the District Court found that the reasons for guardianship were not in A.B.'s best interests and that the evidence supported termination. Reviewing the testimony and evidence presented in the District Court in the light most favorable to the prevailing party, we cannot conclude that the court abused its discretion when it found that Mother failed to overcome the

17

presumption that termination was in A.B.'s best interests and that adoption was preferable to guardianship. We are not in a position to evaluate the evidence for a different outcome; we determine only whether the court abused its discretion. *Woerner v. Woerner*, 2014 MT 134, ¶ 29, 375 Mont. 153, 325 P.3d 1244 (citations omitted). The court did not act arbitrarily, without employment of conscientious judgment, or exceed the bounds of reason resulting in substantial injustice. *In re D.B. & D.B.*, ¶ 16. It had substantial, credible evidence which it did not misapprehend to support its determination that it was in A.B.'s best interests to terminate Mother's parental rights.

## CONCLUSION

¶41    The District Court did not err when it determined that Mother's condition or conduct rendering her unfit to parent was unlikely to change within a reasonable time. It did not abuse its discretion when it determined that termination was in A.B.'s best interests and that Mother did not overcome the presumption in favor of termination. We affirm.


/S/ BETH BAKER


We concur:

/S/ MIKE McGRATH
/S/ JIM RICE
/S/ JAMES JEREMIAH SHEA
/S/ INGRID GUSTAFSON
/S/ LAURIE McKINNON
/S/ DIRK M. SANDEFUR

Justice Ingrid Gustafson, concurring.

¶42 Based on the standard of review—abuse of discretion—I concur with the majority's opinion that the District Court did not abuse its discretion in terminating Mother's parental rights. I write, however, to point out my concerns regarding this case and to provide information as to myths surrounding guardianships in child dependency cases.

¶43 While under our standard of review, I concur the District Court did not abuse its discretion in terminating Mother's rights, I do believe the circumstances of this case would have been more appropriately resolved through a guardianship as was advocated for by Grandmother (the adoptive placement), Mother, Father, the guardian ad litem, and the CASA worker.

¶44 There is little debate that children generally do better when they maintain regular, ongoing contact with their family of origin. Montana's own child dependency policy supports this. It is the policy of the state of Montana to "provide for the protection of children whose health and welfare are or may be adversely affected and further threatened by the conduct of those responsible for the children's care and protection" and to "achieve these purposes in a family environment and *preserve the unity and welfare of the family whenever possible.*" Section 41-3-101(1)(a)-(b), MCA (emphasis added). The loss a child experiences when separated from a parent is profound and can last into adulthood. *See* Vivek Sankaran, Christopher Church & Monique Mitchell, *A Cure Worse Than the Disease? The Impact of Removal on Children and Their Families*, 102 Marq. L. Rev. 1161, 1165-69 (2019); *see also* Erin Sugrue, Alia Innovations, *Evidence Base for Avoiding*

19

*Family Separation in Child Welfare Practice: An Analysis of Current Research – July 2019* (2019), https://perma.cc/CU4D-JTM6.  The factor most closely associated with positive outcomes for children is when they remain safely connected to their families.  Logically then, it is counterproductive to terminate a parent's rights when such does not increase the overall safety or stability of the child and is not in the best interest of the child's family.

¶45    Montana has long included guardianship as a permanency option, which advances its overarching policy of preserving the unity and welfare of the family in child dependency cases.  Sections 41-3-444, -445(8), MCA.  In 1999, HB 180—a bill requested by the Department to authorize guardianship as a permanency option—was adopted.  *See* 1999 Mont. Laws ch. 428.  Pursuant to the legislative history, the primary purposes of HB 180, initially codified at § 41-3-421, MCA (1999), and now renumbered as § 41-3-444, MCA, was to increase permanent placement options for a child; promote reunification; provide an alternative for children for whom there is no compelling reason to terminate parental rights, yet cannot live at home; provide for situations where a child has strong bonds with the parent or other reasons when parental rights are not terminated, but permanent placement with the parents is not possible; allow children to stay in families when relationships have been formed; look at placement through the eyes of a child; and to ensure those becoming permanent guardians are committed to a long-term relationship with the child.

¶46    In 1994 with the passage of the Social Security Act Amendments of 1994, Pub. L. No. 103-432, § 208, 108 Stat. 4398, 4457-59—and later expanded in 1997 through the Adoption and Safe Families Act of 1997, Pub. L. No. 105-89, § 301, 111 Stat. 2115,

2127-28—States were able to conduct child welfare demonstration projects involving the waiver of certain requirements of Titles IV-B and IV-E of the Social Security Act. The waivers granted States flexibility in using Federal funding for alternate services and supports—including subsidized guardianships—that promote safety, permanence, and well-being for children within the child protection system. Unfortunately, since becoming one of eleven original states to have implemented a subsidized guardianship demonstration and thereafter opting to continue with its guardianship assistance program (GAP) [1] under the Fostering Connections to Success and Increasing Adoptions Act of 2008, Pub. L. No. 110-351, § 101, 122 Stat. 3949, 3950-53, *see* Children's Bureau, U.S. Dep't of Health & Human Servs., *Synthesis of Findings: Subsidized Guardianship Child Welfare Waiver Demonstrations* 2 (2011), https://perma.cc/CNC6-CYER, it appears Montana has underutilized guardianships as an effective permanency option.

¶47 As partially demonstrated in this case, a variety of myths and misconceptions exist regarding the safety, permanency, and effectiveness of guardianships. These myths and misconceptions include but are not necessarily limited to: guardianships are not permanent and have higher re-entry rates in the child welfare system; guardianships result in worse outcomes for children; Montana will not approve subsidy payments for guardianships;

---

[1] GAPs provide financial support for children exiting foster care to permanent guardianships with kin. They have steadily expanded such that as of September 2017, 36 states and the District of Columbia had approved GAPs. Assistant Sec'y for Planning & Evaluation, U.S. Dep't of Health & Human Servs., *Title IV-E GAP Programs: A Work in Progress* 1 (2017), https://perma.cc/R5CQ/BMQL.

guardianships can be easily undone; and guardianships are only appropriate for older children.

**Guardianships Are as Permanent as Adoption**.

¶48    Research has shown the availability of guardianships increases overall family permanence.  Research relating to subsidized guardianships has found no appreciable differences in stability among comparable groups of children exiting to adoption as compared to those exiting to guardianship.  Children's Bureau, U.S. Dep't of Health & Human Servs., *Synthesis of Findings: Subsidized Guardianship Child Welfare Waiver Demonstrations* 19-20 (2011), https://perma.cc/CNC6-CYER.

¶49    The Department's most recent Reports Oriented Management (ROM) data[2] is consistent with these research findings in that re-entry rates into the child dependency system were lower for children exiting to guardianship than those for children exiting to adoption over the last five years.  The ROM data shows children exiting to guardianship on average spent 348 days less time in foster care prior to guardianship finalization than those in foster care prior to adoption finalization.  Resoundingly, the research suggests permanency is more closely tied to the child's relationship with his/her placement than to an ultimate legal designation.  Children's Bureau, U.S. Dep't of Health & Human Servs., *Synthesis of Findings: Subsidized Guardianship Child Welfare Waiver Demonstrations* 18-20 (2011), https://perma.cc/CNC6-CYER.

---

[2] Available through the Department and soon to be available on the Department's website.

22

**Guardianships Do Not Result in Worse Outcomes for Children**.

¶50    Research relating to subsidized guardianships has found no appreciable differences in child well-being—school performance, safety, engagement in risky behaviors, access to and satisfaction with services and supports, and overall quality of life—among comparable groups of adopted and guardianship children. *See* Children's Bureau, U.S. Dep't of Health & Human Servs., *Synthesis of Findings: Subsidized Guardianship Child Welfare Waiver Demonstrations* 20 (2011), https://perma.cc/CNC6-CYER.    Further, research shows subsequent abuse and neglect—re-entry into the child welfare system—is lower among children discharged to guardianship as compared to adopted children.  Leslie Cohen & Mark Testa, Children & Family Research Ctr., *Subsidized Guardianship and Permanence* (2004), https://perma.cc/28FD-W626.  In subsidized guardianship waiver demonstrations, research indicates guardianship significantly decreases the time to permanency, *see* Children's Bureau, U.S. Dep't of Health & Human Servs., *Synthesis of Findings: Subsidized Guardianship Child Welfare Waiver Demonstrations* 18 (2011), https://perma.cc/CNC6-CYER, an area identified by federal audit of the Montana Department as needing substantial improvement.  The Department has not demonstrated outcomes for children exiting to guardianship to be any worse than those exiting to adoption in Montana.  In fact, evidence from Montana demonstrated children who exited care to adoption are not safer nor do they have better well-being outcomes than children who exited care to guardianship.  James Bell Assocs., Children's Bureau, U.S. Dep't of Health & Human Servs., *Profiles of the Title IV-E Child Welfare Waiver Demonstration*

23

*Projects: Volume 1: Demonstrations Active between Federal Fiscal Years 1996 and 2012* 113 (2013), https://perma.cc/5KEU-5BNF.

**Montana Will Subsidize Guardianships**.

¶51 As discussed above, Montana was one of eleven states to have originally implemented a subsidized guardianship waiver demonstration, following which it elected to continue with a GAP post the initial demonstration period. Contrary to CPS Larcom's testimony, the Department has not, under its current Child and Family Services Division Administrator, denied any request for a guardianship subsidy, even if the child is not IV-E eligible, nor has the idea that adoptions are more permanent than guardianships been a "hot topic" of Montana's federal review as intimated to by CPS Larcom.[3] As discussed above, the legislative history of § 41-3-421, MCA (1999), now § 41-3-444, MCA, indicates guardianship was added to promote safety, permanence, and well-being for children within the child protection system, and to this end, the Legislature also provided a means for subsidizing guardianships.

**Guardianships Are Not Only Appropriate for Older Children**.

¶52 Pursuant to § 41-3-445(8), MCA, Montana's permanency options include: reunification, permanent placement with the noncustodial parent, adoption, guardianship, and long-term custody in a planned permanent living arrangement. While there is statutory preference for reunification with a parent, there is no statutory preferred permanency option

---

[3] While it is accurate Montana's federal review identified deficiencies in meeting timely permanency standards, the deficiencies relate to the average time a child spends in care prior to adoption, rather than a conclusion that adoption in Montana is more permanent than guardianship.

between guardianships and adoptions. When initially adopted, § 41-3-421, MCA (1999), now § 41-3-444, MCA, permitted a guardianship only if the child was at least 12 years old or in a group of siblings at least one of whom was at least 12 years old. Recognizing a child's age should not preclude the safety, permanency, and well-being a guardianship could offer, this age limitation, at the request of the Department, was eliminated nearly twenty years ago in 2001. *See* 2001 Mont. Laws ch. 281, § 15 (codified as § 41-3-444, MCA).

**Guardianship Are Not Easily Undone**.

¶53 With some frequency CPS workers express the idea that guardianships are easily undone merely by a parent filing a request to terminate the guardianship after dismissal of the child dependency case. In this case, CPS Larcom testified her main objection to a guardianship in this case was that it "would leave the child open to continued litigation for the next 15 years" as a parent could potentially seek to dissolve a guardianship.[4] The incidence of termination of guardianships is very rare, and the incidence of termination of guardianships not supported by the Department are even more rare. It does not appear the Department has even been involved in any contested legal actions over the past five years involving a parent petitioning to dissolve a previously ordered guardianship. CPS Larcom's testimony actually highlighted the infrequency and unlikelihood of this occurring. CPS Larcom, who has worked for the Department as a social worker, a CPS

---

[4] It is noted this idea is incongruous with the Department's offering Mother a guardianship earlier in the case. When Mother was earlier offered the option of guardianship, no concern was expressed that she would engage in years of litigation to undo the guardianship in the future.

supervisor, and now as a regional child welfare manager—working a total of 11 years for the Department—testified she had *never* seen a scenario where a parent attempted to undo a guardianship, was denied by the court, and then came back again. The risk of 15 years of litigation in this case seems far exaggerated. CPS Larcom, after considerable prompting by the State, did testify about one particular guardianship termination action in which the Department took no position. From this isolated case, it is not possible to conclude with any reliability that A.B. was at risk of 15 years of future litigation or that future litigation would actually be contrary to A.B.'s best interests. Here, Mother and Grandmother are co-parenting, and it is clear their intention is to continue to do so. Mother has a strong bond with A.B., and if Mother and Grandmother believe Mother is able to appropriately parent in the future, it is likely A.B. will return to Mother's care regardless of the legal designation of his adoption by Grandmother. While not an abuse of discretion, termination of Mother's parental rights to avoid the very remote chance of future litigation in this case did little, if anything, to improve A.B.'s safety, permanency, or well-being.

¶54 On a broader basis though, guardianships granted pursuant to § 41-3-444, MCA, are not easily revoked. A parent would have to file a petition to revoke the guardianship. The court must hold a hearing on the request and the Department, the guardian, and other persons directly interested in the welfare of the child must be provided notice of the hearing. § 41-3-444(6), MCA. The parent petitioner would then have to establish at hearing that it is in the child's best interest to revoke the guardianship. This, by its nature, would require not only that the parent petitioner demonstrate she or he had successfully addressed the condition rendering him or her unable to parent when the guardianship was

26

established, but also that at the time of the hearing, it is in the child's best interests to revoke the guardianship and restore custody to the parent rather than to the Department. Section 41-3-444, MCA. If the parent is able to meet this high evidentiary hurdle, why would the Department desire the child to be maintained in a situation that no longer meets his or her best interests?

¶55 Further, I believe the Opinion, to some extent, misconstrues Mother's argument on appeal. Mother does not assert she is capable of parenting A.B. on a full-time basis, nor does she seriously contest the District Court's finding that the condition rendering her unable to parent on a full-time basis is not expected to resolve in a reasonable period of time. Rather, Mother argues that given the particular circumstances here—her strong bond with A.B., her near daily interaction with A.B., her current and expected co-parenting of A.B., and the overall family dynamic—granting Grandmother's petition for a guardianship, rather than terminating her parental rights and Grandmother then adopting A.B., is in A.B.'s best interests.

¶56 In this case, A.B. resides with Grandmother and has done so for over two years. Despite this, A.B. has a strong, close bond with Mother, who provides significant parenting to A.B. When asked about the impact on A.B. if his ties to his mother were permanently severed, CPS Larcom admitted "mother should have continued contact with A.B."—yet the Department advocated for a disposition, which is arguably designed to eliminate a relationship between A.B. and his Mother. Grandmother and Mother testified they have been co-parenting A.B. and CPS Larcom testified Grandmother is assertive enough to challenge Mother and look out for A.B.'s best interests. Grandmother has, throughout the

27

duration of the case, proven she is able to keep A.B. safe, while maintaining a positive and safe relationship with Mother, and she undoubtedly would continue to do so whether the legal relationship be that of guardian or adoptive parent. It is unrefuted Mother has participated in the care of A.B. and made substantial gains in parenting skills. Mother and Grandmother—who is the Department's identified adoptive placement and who the Department believes has the capacity to determine A.B.'s best interest and to act to meet those interests—agree that given time, Mother could regain her ability to parent A.B. and that, if she does so, it would be in A.B.'s best interest to return to Mother's care. While Grandmother expressed concern for her daughter that termination of Mother's parental rights was not in Mother's best interests, there was no evidence Grandmother would forego A.B.'s best interests merely because she also has concerns for her own daughter. All members of A.B.s family, including Grandmother, Mother, and Father, as well as A.B.'s visit coach, the Guardian Ad Litem, and the CASA worker believe guardianship, rather than termination, is in A.B.'s best interest.

¶57 The testimony of CPS Larcom and CPS Sanderson expressing a preference for adoption over guardianship seems related to a generalized belief—which is now being shown to be unfounded by the emerging research—that adoption is the preferred permanency option to a guardianship, rather than to an individualized consideration of A.B.'s best interests under the circumstances of this case. CPS Larcom testified that in her professional opinion adoption is the best permanency option, "All my training and experience, in the child welfare systems, says that the primary consideration, as an alternative plan [to reunification], should be adoption." Unfortunately, the testimony of

28

the CPS workers also demonstrates a desire to sanction Mother for failing to adequately address her substance use disorder. CPS Larcom admitted guardianship would have been available to Mother a year prior because she was "far more engaged in her treatment" but was now not being offered. CPS Sanderson actually testified that not terminating Mother's rights would "almost reward [Mother], in a way, for not following her treatment plan. That her - - she would continue to still have her rights." This testimony not only discounts the concept that what is in this family's best interest is quite likely in A.B.'s best interests, it also shows a fundamental lack of understanding of the disease of addiction.

¶58 With very little to no risk Mother would ever seek to dissolve the guardianship,[5] termination of Mother's parental rights—such that Grandmother is now his mother and Mother is now his sister—provided no real benefit to A.B. in terms of stability, permanency, and well-being, while simultaneously disrupting the best interests of his family. Further, in the event of Grandmother's death or incapacity, the termination of Mother's parental rights would eliminate Mother as a future placement option—even if at that time, she continues to have a strong parental bond with A.B., is a safe and appropriate caregiver, and is the Department's preferred placement.[6]

---

[5] CPS Larcom identified Father as her primary concern for future litigation to dissolve the guardianship. Father's parental rights have been terminated and he has not appealed the termination. Mother and Grandmother both testified Mother would not file in court to regain custody of A.B.

[6] Department policy precludes placement with individuals whose parental rights to their children have been terminated.

¶59 It is, at best, incongruous for the Department to assert Grandmother is the primary caregiver best suited for making decisions on behalf of A.B. and determining A.B.'s best interests and providing for them, but then not defer determination of what is in A.B.'s best interest—preservation of his Mother's parental rights—to her and instead force an adoption upon her. Here, there is no doubt Mother will continue to be engaged in A.B.'s life as she has been over the duration of this case. In the event Mother regains the ability to parent on a full-time basis, Grandmother will most likely return A.B. to her care, regardless of the legal termination of Mother's parental rights. Under the circumstances created by the Department here, it is unlikely Grandmother will seek further assistance from the Department, even if she were in need of such. Rather than seek termination of Mother's parental rights, I believe it would have been far more prudent for the Department to work *with* A.B.'s family, *not against them*, to accomplish the guardianship.

/S/ INGRID GUSTAFSON

Justice Dirk Sandefur and Justice Laurie McKinnon join in the concurring Opinion of Justice Gustafson.

/S/ DIRK M. SANDEFUR
/S/ LAURIE McKINNON