FILED

09/13/2022

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

DA 21-0407

IN THE SUPREME COURT OF THE STATE OF MONTANA

2022 MT 175

IN THE MATTER OF:

A.M.G. and S.M.H.,

      Youths in Need of Care.

APPEAL FROM:    District Court of the Eleventh Judicial District,
In and For the County of Flathead, Cause Nos. DN 19-017(C) and DN-19-016(C)
Honorable Heidi J. Ulbricht, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

          Jennifer Dwyer, Avignone, Banick & Williams, Bozeman, Montana

      For Appellee:

          Austin Knudsen, Montana Attorney General, Katie F. Schulz, Assistant Attorney General, Helena, Montana

          Travis R. Ahner, Flathead County Attorney, Renn Fairchild, Deputy County Attorney, Kalispell, Montana

                Submitted on Briefs:  June 29, 2022

                         Decided:  September 13, 2022

Filed:

                            _____
                                      Clerk

Chief Justice Mike McGrath delivered the Opinion of the Court.

¶1      K.H. appeals a July 19, 2021 Eleventh Judicial District Court ruling terminating her parental rights to children A.M.G. and S.M.H.  She argues that the District Court abused its discretion in determining that the conduct or condition rendering her unfit to parent is unlikely to change within a reasonable time.[1]  We affirm.

¶2      We restate the issue on appeal as follows:

*Whether the District Court abused its discretion in terminating parental rights on the basis of a finding that the condition or conduct rendering the mother unable to safely parent was unlikely to change within a reasonable time.*

**FACTUAL AND PROCEDURAL BACKGROUND**

¶3      On February 14, 2019, the Department of Public Health and Human Services, Child and Family Services Division (the Department) responded to a report that K.H., her significant other, C.H., and K.H.'s two small children were living in their car with no alternative shelter, having recently arrived from Washington State.  The Department arranged for K.H. and her children to stay at the Samaritan House for the night.  The Department continued its investigation, based on C.H.'s extensive history with the Department, the lack of shelter, an alleged history of substance abuse, and concerns regarding whether S.M.H.'s medical needs were being met.[2]  Approximately a week later,

---

[1] On March 22, 2022, we granted the Department of Public Health and Human Services, Child and Family Services Division's unopposed motion to consolidate the cases regarding A.M.G. and S.M.H. into a single appeal.  *See In re A.M.G. and S.M.H.*, No. DA 21-0407, Order (Mont. Mar. 22, 2022).

[2] K.H. had put up a GoFundMe page seeking "serious help with paying our child's medical needs" as "he was born 4 weeks early with some complications with his heart and he's not keeping his body temperature."

the Department began looking for the family again, eventually finding K.H., her babies, C.H., and a friend staying at a motel. Concerned about the lack of baby food in the room, S.M.H.'s unwell appearance,[3] and the lack of suitable sleeping arrangements for the children, the Department determined that the children were in "immediate danger" and conducted an "emergency removal," taking the children into custody.

¶4 A show cause hearing was held by the District Court on March 15, 2019. K.H. stipulated to the adjudication of the children as Youths in Need of Care and the grant of Temporary Legal Custody (TLC) to the Department. The court granted TLC to the Department and, at a subsequent hearing, approved K.H.'s treatment plan. The treatment plan required K.H. to, among other things, complete a mental health assessment with Charlotte O'Hara (O'Hara) and, if recommended, complete a psychological evaluation and attend counseling as directed by an approved provider. It also required her to attend supervised visits with S.M.H. and A.M.G., engage in parenting services and complete recommended parenting classes. The plan required K.H. to keep the Department informed of her current contact information, and maintain a verifiable source of income, and provided that anyone residing with K.H. must pass a Department background check. It required K.H. to contact the Department every two weeks for updates and attend a monthly in-person meeting in which she "shall explain any barriers in completing this plan" and "attend all family engagement meetings and timely comply with any tasks assigned to her

---

[3] The children were taken to a hospital that night, but found to have no acute health concerns beyond S.M.H.'s conjunctivitis.

at these meetings." The plan noted that K.H. had been in contact with the Department to date and had been regularly visiting with A.M.G. and S.M.H. The Department confirmed that K.H. understood her responsibilities under the plan.

¶5 A July 25, 2019 Court Appointed Special Advocates (CASA) report indicated that the children were in foster care and that K.H. was employed, working hard on her parenting skills, and hoping to find more stable housing. At an August, 2019 hearing, the Department commended K.H. for attending all of her children's appointments. However, there was an open discussion about K.H.'s continued relationship with C.H. and the Department's concern regarding allegations of domestic abuse, and the court advised K.H. to contact a local women's shelter to implement a safety plan.

¶6 In October 2019, the Department moved for an extension of TLC, indicating that K.H. was progressing well on her treatment plan, seeing O'Hara on a weekly basis, attending and progressing well in visitations with the children, and keeping in contact with the Department. However, K.H. had quit her job in June and was living in a trailer in a Home Depot parking lot after she had been evicted from a Motel 6 due to domestic violence, and had been seen with a black eye and a swollen lip. She also had emergency gall bladder surgery that her father believed was due to being beaten by C.H.

¶7 At an October 25, 2019 hearing, K.H. stipulated to an extension of TLC, and the Department reported that K.H. was "doing really, really well" with visitations and making all of her appointments for her children's therapy. However, the court noted K.H.'s continued relationship with C.H.—whom, after DNA testing was conducted, the Department advised was not the father of the children—as a potential barrier to

4

reunification. A CASA report on February 12, 2020 indicated that K.H. had recently missed a number of visits due to seizures, resulting in several emergency room visits. It also indicated that K.H. was cleaning rooms at a motel in which she was living month-to-month, and still had not completed a psychological evaluation. The report indicated that K.H. stated she had ended her relationship with C.H., but the Department believed this not to be true.

¶8     At a May 1, 2020 hearing, K.H. stipulated to a permanency plan and another extension of TLC. The Department advised that it believed this should be the last extension, noting that fifteen months had passed and while K.H. had initially progressed in many areas, she had "kind of plateaued there." K.H. stated that she had ended her relationship with C.H. K.H. acknowledged that she had been unsuccessful in seeing her children through most of the scheduled visitation hours, conducted virtually since the arrival of COVID-19, alleging the facilitator or the foster parent failed to be available.[4] At a May 15, 2020 hearing, K.H. advised that she had taken a trip to Spokane, Washington, and that she had missed several remote visits when her phone crashed.

¶9     An August 18, 2020 review by the Foster Care Review Committee found that K.H. had not made progress towards alleviating the need for placement. A CASA report in

---

[4] The record suggests that some friction had developed between K.H. and the foster mother during this time. A July, 2019 CASA report indicated that the foster mother did not want K.H. to hold her children because she was "unkempt" and had tried to prevent K.H. from staying with S.M.H. in the hospital after a surgery, requiring intervention by a social worker. K.H. later reported that she was upset to learn that her children called the foster mother "mom," believing that she was "being replaced," that she believed that A.M.G. would get in trouble for hugging K.H., and that she felt that reunification was no longer the goal.

September indicated that K.H. had allowed her Medicaid to expire, was still involved with C.H., had missed many scheduled parenting sessions, both in-person and virtually, was inconsistent in following up with her counselor, and did not have stable housing or reliable income. In support of a September 11, 2020 petition for a third extension of TLC, a Department affidavit stated that, while K.H. had completed a psychological evaluation, she had not been attending her therapy visits with O'Hara as recommended by the evaluation, and had continually missed parenting visits in August resulting in a suspension of visits, followed by her failure to attend a September 8, 2020 visit after visitation was reinstated.

¶10 At the September 25, 2020 TLC extension hearing, a Department case worker testified that K.H. had not attended a visit with the children since around July 2020 and that the Department had been unable to make contact with her. K.H. responded that she had attempted to attend the virtual visits, but that no one had connected to her calls. The foster father disputed this, stating on the record that "any time that there has been a visitation scheduled, be it in person or virtual, . . . my wife has the kids ready and sitting there waiting. And this happened numerous times it doesn't take place, and it's not on our end." K.H. also advised, apparently for the first time, that she had moved to Burien, Washington, to seek better doctors to treat her epilepsy. K.H. asked about transferring the case, and the court advised K.H. to consult with her attorney.

¶11 K.H. attended virtual visits in November, but a CASA report noted that it was difficult for the children to engage in these visits as they lost interest in communicating through a screen. Further, K.H. had two black eyes and her nose appeared to be broken.

6

Additionally, the CASA report indicated that K.H. had had another child in December with C.H.

¶12　The Department filed petitions to terminate parental rights (TPR) on March 19, 2021. The Department was unable to locate K.H. and conducted service by publication.

¶13　At the TPR hearing on July 19, 2021, the children's child protection specialist, Jodi Black-Fucci (Black-Fucci) testified that, after learning of K.H.'s move to Washington State, she had struggled to contact K.H. and, because K.H. had not signed the necessary release, had been unable to directly inquire of providers in Washington with whom K.H. was purportedly working. Black-Fucci said she had been unable make referrals for her because K.H. would not divulge her location. Black-Fucci testified that K.H. had not used available resources to help with accessing stable housing.

¶14　Black-Fucci also testified that K.H. had not successfully completed the mental health and domestic violence goals of her treatment plan, noting that K.H. had multiple black eyes and had continued a relationship with C.H., and that the couple had lost housing at a motel due to domestic violence. She testified that, while K.H. did complete a psychological assessment with O'Hara, she was not consistent in continuing to see her or engaging in treatment. With regard to parenting, Black-Fucci testified that K.H. had completed parenting classes, but that her absence from the area prevented her from returning to face-to-face visitation with the children after COVID-19 restrictions lifted. She testified that K.H. never progressed to semi-supervised or unsupervised visits due to safety concerns and that K.H. had not seen her children in person since the summer of 2020.

¶15    Black-Fucci also testified that K.H. had never, to her knowledge, succeeded in obtaining safe and stable housing.  Since leaving Montana, K.H. had not disclosed her location to the Department, but Black-Fucci had heard that K.H. was currently residing in Wisconsin with A.M.G.'s birth father, after leaving C.H., with whom she had recently had a child.

¶16    K.H., appearing remotely—apparently from Wisconsin—testified that, after moving to Washington, she had asked to continue seeing O'Hara remotely for counseling, but had been advised over email by Black-Fucci that she could no longer see O'Hara from out of state due to being unable to access Medicaid payments.  She testified that she moved to Washington to access better resources, because she was pregnant, and because she felt like she and C.H. were being "watched really closely" by the Department.  She further testified that she didn't believe that the foster parents supported a goal of reunification.  On cross-examination, K.H. agreed that she had never given the Department her address after moving to Washington and that this hindered reunification efforts by preventing the Department from conducting a home check.  She further agreed that she had been aware when she chose to move to Washington that being out of state would affect her ability to see the children in person and could frustrate reunification efforts.

¶17    The court granted the petitions to terminate parental rights, finding that K.H. had failed the treatment plan and was unlikely to change in a reasonable amount of time, and issued a written order on July 23, 2021.  K.H. appeals.

8

## STANDARD OF REVIEW

¶18 We review a district court's decision to terminate parental rights for an abuse of discretion, which occurs when the district court acts arbitrarily, without employment of conscientious judgment, or in excess of the bounds of reason, resulting in substantial injustice. *In re A.B.*, 2020 MT 64, ¶ 23, 399 Mont. 219, 460 P.3d 405 (citing *In re R.J.F.*, 2019 MT 113, ¶ 20, 395 Mont. 454, 443 P.3d 387). Conclusions of law are reviewed for correctness while findings of fact are reviewed for clear error. *In re A.B.*, ¶ 23 (citing *In re D.B. & D.B.*, 2007 MT 246, ¶ 16, 339 Mont. 240, 168 P.3d 691). Factual findings are clearly erroneous when not supported by substantial evidence, the result of a misapprehension of the effect of the evidence, or if review of the record convinces this Court that a mistake was made. *In re A.B.*, ¶ 23 (citing *In re J.B.*, 2016 MT 68, ¶ 10, 383 Mont. 48, 368 P.3d 715). We review the evidence in the light most favorable to the prevailing party when determining whether substantial credible evidence supports the district court's findings. *In re J.B.*, ¶ 10 (citation omitted).

## DISCUSSION

¶19 *Whether the District Court abused its discretion in terminating parental rights on the basis of a finding that the condition or conduct rendering the mother unable to safely parent was unlikely to change within a reasonable time.*

¶20 A court may order the termination of a parent-child legal relationship upon a finding of clear and convincing evidence that the child is an adjudicated youth in need of care and both of the following exist: (i) an appropriate treatment plan that has been approved by the court has not been complied with by the parents or has not been successful; and (ii) the conduct or condition of the parents rendering them unfit is unlikely to change within a

9

reasonable time. Section 41-3-609(1)(f), MCA. K.H. appeals the District Court's finding on the second of these requirements—that the conduct or condition rendering her unfit to parent was unlikely to change within a reasonable time.

¶21 "[C]onduct or condition of the parent" refers to the condition or reason causing the treatment plan to be unsuccessful. *In re M.T.*, 2020 MT 262, ¶ 32 n.6, 401 Mont. 518, 474 P.3d 820; *J.B.*, ¶ 22 (citation omitted). In determining what constitutes a reasonable time, courts must consider that the best interest of the child, though balanced with the right to parent, is "paramount." *In re D.F.*, 2007 MT 147, ¶ 43, 337 Mont. 461, 161 P.3d 825. *See* § 41-3-609(3), MCA; *In re K.L.*, 2014 MT 28, ¶ 15, 373 Mont. 421, 318 P.2d 691. The best interest of the child is presumed to be served by termination of parental rights if the child has been in foster care under physical custody of the state for fifteen of the most recent twenty-two months. Section 41-3-604(1), MCA.

¶22 Section 41-3-423(1), MCA, requires the Department to make "reasonable efforts" to "reunify families that have been separated by the state."[5] We have held that the presence of reasonable efforts by the Department may be a relevant consideration in determining whether the conduct or condition rendering a parent unfit, unwilling, or unable to parent is unlikely to change within a reasonable time under § 41-3-609(1)(f), MCA. *See In re R.J.F.*, ¶¶ 25-28 (citing § 41-3-609(1)(f)(ii), MCA; *In re D.B.*, ¶ 25). While, in some cases, a

---

[5] A 2021 amendment to this statute further specifies that "reasonable efforts" require the department to "in good faith develop and implement voluntary services agreements and treatment plans that are designed to preserve the parent-child relationship and the family unit and shall in good faith assist parents in completing voluntary services agreements and treatment plans." Section 41-3-423(1), MCA (2021 Mont. Laws ch. 222, § 1).

10

"conclusion that a parent is unlikely to change could be called into question if the Department failed to make reasonable efforts to assist the parent . . . , in other cases, a parent's unlikelihood of change may well be unaffected by the Department's efforts." *In re C.M.*, 2019 MT 227, ¶ 22, 397 Mont. 275, 449 P.3d 806 (citing *In re R.J.F.*, ¶ 26). *See also In re C.M.G.*, 2020 MT 15, ¶ 14, 398 Mont. 369, 456 P.3d 1017 ("[A] parent may challenge the State's contention that the conduct or condition rendering the parent unfit is unlikely to change within a reasonable time, by arguing that the department failed to make reasonable efforts." (citing *In re C.M.*, ¶ 22; *In re R.J.F.*, ¶ 26)).

¶23     K.H. alleges that the Department failed to make reasonable efforts, asserting that it should have assisted her after she moved to Washington by purchasing plane tickets with which to attend face-to-face visits with her children to better improve her parenting skills and bond with the children and ensuring she had access to counseling or other services necessary to improve her mental health.  She also asserts that reasonable efforts required the Department to transfer the case to Washington, seek new placement options for the children closer to K.H. in Washington, or provide a courtesy Department worker for her in Washington.  K.H. relies almost entirely upon *In re R.J.F.*, where we determined that the district court had erred in terminating a mother's parental rights on the basis of a determination that the condition rendering the mother unfit to safely parent was not likely to change within a reasonable time in light of the Department's failure to provide reasonable efforts to reunify the mother with her child.

¶24     In *In re R.J.F.,* a woman who resided in North Dakota gave birth while temporarily in Billings, Montana.  *In re R.J.F.,* ¶¶ 3, 6.  The mother tested positive for

11

methamphetamine during the child's birth, and the Department removed the child from the mother's care, eventually placing the child in a non-kinship, foster placement. *In re R.J.F.,* ¶¶ 3, 6.[6] The mother then returned to North Dakota, where she was employed and owned a residence, and the Department arranged for visitation only when she could travel to Billings, 300 miles away, despite knowing that she did not own a car or have a valid driver's license. *In re R.J.F.,* ¶ 3. The mother filed a petition to transfer venue to the county in which she resided in North Dakota, which the district court denied. *In re R.J.F.,* ¶ 5. With regard to treatment, the Department only met with the mother "whenever she could make it to town." *In re R.J.F.,* ¶ 6. Eventually, the Department arranged for intermittent flights to Billings, though the mother lived over an hour drive from an airport and still did not have a car or valid driver's license. *In re R.J.F.,* ¶ 7 n. 6. The Department did not reach out to establish any services in North Dakota for the mother and eventually discontinued visitation assistance. *In re R.J.F.,* ¶ 10. Only eleven months after the child's removal, the Department sought termination of the mother's parental rights for failure to complete her treatment plan. *In re R.J.F.,* ¶ 10. The mother then sold her home and moved to Billings "to fight her case and get clean" and began actively seeking out services, despite the Department advising that it did not have time to schedule visits. *In re R.J.F.,* ¶¶ 11-13. The mother subsequently suffered a relapse and was hospitalized, precipitating a move to California where her mother and step-father lived. However, the mother contacted the

---

[6] The Department in *In re R.J.F.* did not engage in any efforts to investigate or locate a kinship placement and, when the mother identified two potential kinship placements, failed to meaningfully investigate or pursue these placements. *In re R.J.F.,* ¶ 32.

child's father who assured her he would work with the Department to obtain custody. *In re R.J.F.,* ¶ 13. By the close of the termination hearing, the mother had made substantial progress in her treatment plan and taken significant initiative in participating in various programs and classes. *In re R.J.F.,* ¶ 16. On appeal, we held that, in light of the nature of the addiction the mother was battling and her considerable progress when she was able to access resources, the Department's failure to provide reasonable efforts had contributed to her lack of progress over the first eleven months of the case and that the district court had therefore erred in finding that the Department had presented clear and convincing evidence that the condition or conduct rendering the mother unfit to parent was unlikely to change in a reasonable time. *In re R.J.F.,* ¶¶ 37, 44, 48.

¶25 K.H., unlike the mother in *In re R.J.F.*, did not demonstrate an ability to make significant progress pursuant to her treatment plan, even when resources were available to her. Though K.H. did initially make some progress and attend her children's visitations and appointments in 2019 and into early 2020, she failed to acquire stable housing or employment, and had continued in a relationship the Department believed to be violent and unsafe for the children. Moreover, K.H.'s early progress and high rate of attendance at her children's visitations and appointments dropped off precipitously after May of 2020, resulting in a suspension of visits, and K.H. then missed another visit when they were reinstated. Though she blamed this on the foster family, the foster father disputed her contentions. It was within the purview of the District Court to assess credibility. *In re J.W.,* 2021 MT 291, ¶ 38, 406 Mont. 224, 498 P.3d 211 ("Determinations of witness credibility

13

and the weight of testimony are within the exclusive province of the trier of fact[.]" (citations omitted)).

¶26 The visits K.H. did have with her children no longer demonstrated any meaningful progress in parental skills or bond. While K.H. points out that the virtual visitation format, initially implemented due to COVID-19 restrictions, presented significant challenges to engaging with such young children, the record indicates that K.H. failed to implement most of the strategies the Department offered her to improve engagement through that format. During this time, K.H. also stopped attending her therapy sessions and let her Medicaid expire. Unlike the mother in *In re R.J.F.*, who moved to transfer her case and then, when the motion was denied, moved closer to her children to increase her ability to be involved, K.H. abruptly moved away from her children to Washington State and did not subsequently move to transfer the case, despite the District Court suggesting that she consult with her attorney about doing so. In contrast to the mother in *In re R.J.F.*, K.H. did not make plans for continued involvement with the Department upon leaving the state. *See In re R.J.F.*, ¶ 13.

¶27 Unlike the mother *In re R.J.F.*, K.H. has not shown that the provision of more resources by the Department would have led to a different result. To the contrary, the record indicates that, after May of 2020, K.H. was no longer willing to accept significant involvement and assistance from the Department. On appeal, K.H. faults the Department for failing to do more for her after she left Montana. However, because K.H. had dropped out of contact with the Department, declined to timely inform them of her move and new

14

residence, had not signed releases or otherwise shared information with the Department,[7] the Department's ability to assist her in meeting the goals in her treatment plan was curtailed. By the time the Department filed for termination of K.H.'s parental rights in March of 2021, they were still unable to locate K.H. Moreover, other than her assertion that the Department had responded in the negative to her inquiry regarding whether she could see O'Hara for remote counseling after she had left the state and allowed her Medicaid to lapse, the record contains no indication that K.H sought more support from the Department following her move. On a number of occasions throughout the case, the District Court had asked K.H. if the Department could do anything more to support her. In sharp contrast to *In re R.J.F.*, the record here indicates that the limiting factor in K.H.'s progress towards meeting her treatment plan goals was her own willingness to engage, not the Department's provision of services. The record clearly supports the District Court's finding that K.H. had "disengaged" after moving to Washington and did not "make any progress in her treatment or visitation" after May 2020.

¶28 While the Department is required to "diligently attempt to contact reluctant parents and engage them with services," it is not required to endlessly pursue an unwilling parent who does not wish to be found with services the parent does not wish to receive. *See In re R.L.*, 2019 MT 267, ¶¶ 22, 25, 397 Mont. 507, 452 P.3d 890 (mother "resisted

---

[7] K.H. testified that she moved to Washington to seek better epilepsy treatment and because she was pregnant and felt like C.H. and her were being closely monitored by the Department. The Department alleges that she was hiding from the Department to avoid its intervention with her third child.

engagement with the Department, abruptly moved to another state, failed to provide her CPS worker with reliable contact information, and then never contacted her CPS worker again," constituting "apathy and/or active resistance to engagement" that supported a finding that the condition or conduct rendering the mother unable to safely parent was unlikely to change within a reasonable time). Rather, a parent has an obligation to engage with the Department to successfully complete the treatment plan. *In re R.J.F.*, ¶ 38 (citation omitted). *See In re C.B.*, 2014 MT 4, ¶¶ 19, 23, 373 Mont. 204, 316 P.3d 177; *In re D.F.*, ¶ 29; *In re T.R.*, 2004 MT 388, ¶ 26, 325 Mont. 125, 104 P.3d 439; *In re L.S.*, 2003 MT 12, ¶ 11, 314 Mont. 42, 63 P.3d 497. Regardless of K.H.'s argument that the Department is required to provide sufficient services to a parent who has left the area, substantial evidence in the record supports the District Court's factual finding that, in light of K.H.'s unwillingness to engage with the Department following her pregnancy with C.H.'s child, the "Department could not provide additional services . . . and additional services would have likely been unproductive." Here, the record evidence, viewed in the light most favorable to the prevailing party, supports a conclusion that this was a case in which a parent's unlikelihood of change would be unaffected by the Department's efforts. *See In re C.M.*, ¶ 22.

**CONCLUSION**

¶29 Given K.H.'s failure to make progress in her treatment plan and her unwillingness to engage with the Department's efforts to assist her to that end, the District Court did not abuse its discretion by terminating K.H.'s parental rights to A.M.G. and S.M.H. on the basis of its finding that the conduct or condition of K.H. rendering her unfit is unlikely to

16

change within a reasonable time.  The requirements of § 41-3-609(1)(f), MCA, have been satisfied.

¶30    Affirmed.


                                        /S/ MIKE McGRATH


We Concur:


/S/ INGRID GUSTAFSON
/S/ LAURIE McKINNON
/S/ BETH BAKER
/S/ JAMES JEREMIAH SHEA
/S/ DIRK M. SANDEFUR